**Anton ZABOLOTNY and Bernel Zabolotny, Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 92–2168.

United States Court of Appeals, Eighth Circuit.

Submitted March 18, 1993.

Decided Oct. 18, 1993.

Garry A. Pearson, Grand Forks, ND, argued, for appellant.

Robert W. Metzler, Dept. of Justice, Washington, DC, argued, for appellee.

Before FAGG, MAGILL, and HANSEN, Circuit Judges.

toner dust can cause the problems Case has incurred.

HANSEN, Circuit Judge.

Anton and Bernel Zabolotny ("Zabolotnys") appeal the judgment of the United States Tax Court affirming the assessment of excise tax deficiencies against them by the Internal Revenue Service ("IRS") pursuant to 26 U.S.C. § 4975(a) and § 4975(b). We affirm in part and reverse in part.

## I.

The Zabolotnys, North Dakota farmers, struck oil on their land in the 1970s. In 1977, the Zabolotnys leased the mineral rights to their farmland to Gulf Oil Corporation. The oil reserves on their property proved highly productive, providing royalty revenues of approximately $1 to $1.5 million per year.

On May 20, 1981, the Zabolotnys incorporated their farming operation, which was conducted on approximately 1,205 acres of land in western North Dakota, under the name of Zabolotny Farms, Inc. ("the Corporation"). Anton and Bernel Zabolotny each received 670 shares of stock in the Corporation and were the sole shareholders. On this same day, the Corporation also adopted an employee stock ownership plan ("ESOP"). Anton and Bernel, the sole employees of the Corporation, were listed as the plan beneficiaries, and Anton was named the trustee of the ESOP. Also on May 20, 1981, the Zabolotnys sold their farmland, including the mineral rights, to the ESOP. In exchange, the Zabolotnys received a private annuity with annual payments of $478,615. The present value of the future payments was $6,481,915, a purchase price the parties agree was fair and adequate for the land and mineral rights. On July 21, 1981, the Zabolotnys requested a determination letter from the IRS, and on February 18, 1982, the IRS issued a letter informing the Zabolotnys that the ESOP was a qualified trust under § 401(a) of the Employment Retirement Income Security Act of 1974 (ERISA).

On May 20, 1981, Anton Zabolotny, as trustee of the ESOP, entered a two-year lease with the Corporation, and on May 20, 1983, he entered a similar five-year lease. Pursuant to these leases, the Corporation continued to use the surface of the property sold to the ESOP for the farming operation while the ESOP retained all mineral rights. The Zabolotnys remained employees of the Corporation until April 30, 1983; in May 1983, three of the Zabolotnys' children became employees of the Corporation and the sole plan beneficiaries. At the time the Zabolotnys terminated their employment, neither Anton nor Bernel had been an employee of the Corporation long enough to attain a vested interest in the ESOP.

On November 28, 1986, the IRS sent a notice of deficiency to Anton and Bernel Zabolotny. The IRS determined that the May 20, 1981, sale of property by the Zabolotnys to the ESOP was a prohibited transaction giving rise to excise taxes pursuant to 26 U.S.C. § 4975(a) and (b). The IRS concluded that the Zabolotnys owed a first-tier tax of $324,095 for each of the taxable years 1981–86, see 26 U.S.C. § 4975(a), as well as additional taxes of approximately $81,000 for each year the Zabolotnys failed to file an excise tax return, see 26 U.S.C. § 6651(a)(1). The IRS also warned the Zabolotnys that a second-tier tax deficiency amounting to 100% of the value of the transaction would also be imposed if they did not correct the prohibited transaction within the designated correction period. See 26 U.S.C. § 4975(b). The IRS determined that the Zabolotnys did not correct the transaction in a timely manner and thus assessed the 100% second-tier tax deficiency against them.

The Zabolotnys filed a petition for review with the United States Tax Court. The Tax Court agreed with the IRS that the Zabolotnys were liable for the § 4975(a) first-tier excise taxes as assessed due to the fact that the sale of the land and mineral rights to the ESOP was a prohibited transaction. The Tax Court, over strong dissents, also held that the § 4975(b) second-tier excise taxes in the amount of $6,481,915, 100% of the value of the prohibited transaction, for failure to correct the transaction within the designated correction period applied. The Zabolotnys appeal the Tax Court's decision. The Tax Court also determined that because the Zabolotnys reasonably relied on the advice of their accountant and attorney not to file ex-

cise tax returns the IRS incorrectly assessed the additional taxes pursuant to § 6651(a)(1). The IRS does not cross-appeal this finding.

On appeal, we first must determine whether the sale of the land and mineral rights to the ESOP was a prohibited transaction for purposes of § 4975(a), thus triggering application of the first-tier excise tax liability. If we conclude that the transaction was in fact prohibited by the statute, we then must determine whether the Zabolotnys nevertheless corrected the transaction sufficient to avoid imposition of the 100% second-tier excise tax.[1]

## II.

Section 4975 of the Internal Revenue Code imposes excise taxes on persons who enter into "prohibited transactions" with employee pension and benefit plans qualified under ERISA. Congress enacted these taxes in an effort to prevent persons closely involved with a plan to benefit financially from transactions that may prove detrimental to the plan's beneficiaries. See *Wood v. C.I.R.*, 955 F.2d 908, 910 (4th Cir.), *cert. granted*, — U.S. ——, 112 S.Ct. 2937, 119 L.Ed.2d 562, *cert. dism'd*, — U.S. ——, 112 S.Ct. 3061, 120 L.Ed.2d 930 (1992). The tax scheme is two-tiered, with § 4975(a) imposing a mandatory first-tier tax equal to 5% of the amount involved in the prohibited transaction for each taxable year and § 4975(b) imposing a second-tier tax equal to 100% of the amount involved if the prohibited transaction is not timely corrected. The IRS assessed both the first-tier and the second-tier tax liability against the Zabolotnys.

■ The statute defines several types of "prohibited transactions," including a "sale or exchange, or leasing, of any property between a plan and a disqualified person." 26 U.S.C. § 4975(c)(1)(A). The IRS assessed the excise taxes against the Zabolotnys because it characterized the transfer of the land and mineral rights by the Zabolotnys to the ESOP in exchange for the annuity as a "sale or exchange ... of ... property between a plan and a disqualified person." The Zabolotnys concede that they are "disqualified persons" for the purposes of § 4975, and the parties have stipulated that the ESOP is a qualified plan. The Zabolotnys contend, however, that the excise taxes the IRS imposed upon them are inappropriate because the transfer of the land and mineral rights on May 10, 1981, was not a "sale or exchange" and therefore not prohibited.

The Zabolotnys rely on a single statutory provision to support their argument that the transfer at issue was not a "sale or exchange:"

> (3) **Sale or exchange; encumbered property**—A transfer of real or personal property by a disqualified person to a plan shall be treated as a sale or exchange if the property is subject to a mortgage or similar lien which the plan assumes ...

26 U.S.C. § 4975(f)(3). The Zabolotnys argue that this provision limits a "sale or exchange" to a transfer of *encumbered* property only. According to the Zabolotnys, any transfer of *unencumbered* property, such as the land and mineral rights they sold to the ESOP, does not constitute a "sale or exchange" for the purposes of determining whether a transaction is a prohibited transaction. We disagree.

The United States Supreme Court recently analyzed § 4975(f)(3) in the context of an employer who had contributed unencumbered property to a qualified plan to satisfy its minimum funding obligations under ERISA. *C.I.R. v. Keystone Consol. Indus.*, — U.S. ——, 113 S.Ct. 2006, 124 L.Ed.2d 71 (1993). The employer argued that this contribution was not a "sale or exchange" and thus not a transaction prohibited by § 4975(c)(1)(A) and subject to excise taxes. The Court disagreed.[2] In doing so, the *Keystone* Court expressly rejected the proposition that § 4975(f)(3) limits the types of

---

1. At oral argument, the Zabolotnys abandoned their challenge to the Tax Court's jurisdiction over this case.

2. The Court first concluded that any transfer of property applied toward a minimum funding requirement is "both an indirect type of sale and a form of exchange, since the property is exchanged for diminution of the employer's funding obligation." *Keystone*, — U.S. at ——, 113 S.Ct. at 2012.

transactions that are to be considered a "sale or exchange" by excluding all unencumbered property from its definition. *Keystone*, at ——, 113 S.Ct. at 2012–13. Instead, § 4975(f)(3) was intended to "expand ... the scope of the prohibited-transaction provision ... in order to provide additional protection, not to limit the protection already provided by § 4975(c)(1)(A)." *Id.* at ——, 113 S.Ct. at 2013.

The type of additional protection § 4975(f)(3) was intended to provide is perhaps best described by the distinction made in *Keystone* between contributions applied toward a mandatory funding obligation, i.e. "sales or exchanges," and contributions made voluntarily to a plan on a periodic basis. *Keystone* offers the example of an employer who has already met its mandatory funding obligation but simply wishes to reward its employees with an additional contribution to the fund:

> Under [the Supreme Court's] analysis, the property contribution is permissible if the property is unencumbered, because it will not be 'exchanged' for a diminution in funding obligations and therefore does not fall within the prohibition of § 4975(c)(1)(A). On the other hand, the property contribution is impermissible if the property is encumbered, because § 4975(f)(3) specifically prohibits all contributions of encumbered property.

*See Keystone*, at —— n. 2, 113 S.Ct. at 2013 n. 2. According to the Supreme Court, therefore, the role of § 4975(f)(3) is to prohibit those transfers of property that would not otherwise be considered "sales or exchanges" (because they are voluntary contributions to a plan) but, because the property transferred is encumbered, impose a risk of harm to the plan. "[Section 4975(f)(3) ] extends the reach of 'sale or exchange' in § 4975(c)(1)(A) to include contributions of encumbered property that do not satisfy funding obligations." *Keystone* at ——, 113 S.Ct. at 2013 (citation omitted).

In this case, both parties agree that the Zabolotnys, disqualified persons, sold unencumbered property to the ESOP, a qualified plan, in return for a joint and survivor annuity. All such "sales or exchanges," whether they involve encumbered or unencumbered property, are subject to a first-tier 5% excise tax. We conclude therefore that the IRS properly assessed a 5% excise tax against the Zabolotnys for the tax year 1981 pursuant to § 4975(a). Whether such an assessment was appropriate for any of the subsequent years depends upon whether the Zabolotnys properly corrected the prohibited transaction, an issue we address next.

## III.

The Zabolotnys argue that, even if the sale of the land and mineral rights to the ESOP amounted to a prohibited transaction thus triggering the 5% first-tier tax, the transaction was nevertheless self-correcting such that the 100% second-tier tax does not apply. The applicable provision, § 4975(b), reads as follows:

> **Additional taxes on disqualified person.**—In any case in which an initial [5%] tax is imposed by subsection (a) on a prohibited transaction and the transaction is not corrected within the taxable period, there is hereby imposed a tax equal to 100 percent of the amount involved....

26 U.S.C. § 4975(b). The statute then defines "correction:"

> The terms "correction" and "correct" mean, with respect to a prohibited transaction, undoing the transaction to the extent possible, but in any case placing the plan in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards.

26 U.S.C. § 4975(f)(5). The Tax Court determined that a disqualified person must take affirmative action before a prohibited transaction can be considered "corrected" within the meaning of § 4975(b). Because the Zabolotnys did not take any affirmative action to correct the transaction at issue, the Tax Court affirmed the imposition of the second-tier excise tax.

The statute imposes no literal requirement that a disqualified person must take affirmative action before a transaction may be considered "corrected." According to a plain reading of the statute, the extent to which a

disqualified person must "undo" a prohibited transaction depends upon whether "undoing" it is possible and what effect the "undoing" would have on the financial position of the plan. Indeed, the term "corrected" is partially defined as "undoing the transaction *to the extent possible,*" 26 U.S.C. § 4975(f)(5) (emphasis added), indicating that even when rescission is not possible, a correction may nevertheless occur. The only bright-line requirement we find on the face of the statutory definition of "correction" is that after "correction," the plan must be "in a financial position not worse than that in which it would be if the disqualified person were acting under the highest fiduciary standards."

No one can dispute that transferring the land and mineral rights back to the Zabolotnys would be financially devastating to the ESOP. As of April 30, 1982, the ESOP had earned more than $1.3 million in royalties; and as of April 30, 1983, the ESOP had earned over $2 million for the year. On April 30, 1986, the value of the property had exceeded the original purchase price and the cumulative royalty income for the five-year period totaled more than $9 million. The ESOP had a net asset value of $5,287,349.27. In contrast, the cumulative employer contributions to the plan over the five-year period between 1981–86 totaled only $12,900. Any person acting on behalf of the ESOP using the highest of fiduciary standards would consider returns of the magnitude of those from the mineral rights owned by the ESOP indicative of an extremely successful investment.[3]

The Zabolotnys have presented a highly unusual set of circumstances, which are unlikely to appear in combination in a single case. First, Anton and Bernel Zabolotny are both the disqualified persons who entered into the prohibited transaction as well as the ESOP's sole beneficiaries whom the ERISA prohibition against such transactions was intended to protect. The IRS has become engaged, therefore, in a somewhat superfluous endeavor: trying to protect the Zabolotnys in their role as the sole plan beneficiaries from themselves in their role as disqualified persons engaged in dealing with the plan. Second, the prohibited transaction has proved highly productive for the ESOP from the very beginning, leaving it with assets of far greater value than what it would have accumulated from employer contributions alone. The nature of the Corporation's enterprise, a farming operation in western North Dakota, made it unlikely that the Corporation, as an employer, could have made significant contributions in excess of the mandatory minimum funding requirement for the ESOP. Finally, the ESOP purchased extraordinarily valuable property that had been producing royalties in the millions of dollars since 1977. Simply stated, one would be hard pressed to imagine a more financially responsible investment for the plan beneficiaries with a more steady stream of income. The ESOP, therefore, was in exceptional financial condition by the end of the first year of its existence and no plan beneficiary (*i.e.,* neither Anton nor Bernel Zabolotny) was placed at risk of losing benefits under the plan as a result of the prohibited transaction. Given these circumstances, we conclude that the May 20, 1981, prohibited transaction between the Zabolotnys and the ESOP was corrected by the end of the 1981 taxable year. By that time, the statutory purposes of safeguarding the plan and its beneficiaries had been fulfilled. To have unraveled the prohibited transaction then would have placed the plan in a worse condition than if the disqualified persons had acted under the highest fiduciary standards.

## IV.

We hold that the May 20, 1981, sale of land and mineral rights to the ESOP by the Zabo-

---

**3.** The IRS also asserts that, because § 4975(a) imposes a blanket prohibition on certain types of transaction regardless of the transaction's financial success and demands a 5% of the value of the transaction from the disqualified person involved whether or not the transaction turned out to be a "good deal," *see Rutland v. C.I.R.,* 89 T.C. 1137, 1146, 1987 WL 46822 (1987); *Leib v. C.I.R.,* 88 T.C. 1474, 1481, 1987 WL 31360 (1987), the same standards should apply to § 4975(b). We disagree. Congress created a two-tier, not a one-tier, tax liability scheme, and one of the distinguishing features of the second-tier tax is that instead of being imposed automatically it is avoidable through correction. The mandatory nature of the first-tier excise tax simply does not require us to hold that the financial consequences of the transaction to the plan are irrelevant for the purposes determining the propriety of a second-tier excise tax liability.

lotnys in return for an annuity paying the Zabolotnys $478,615 per year was a prohibited transaction for the purposes of 26 U.S.C. § 4975(c)(1)(A). We also hold, however, that the Zabolotnys corrected this prohibited transaction within the meaning of § 4975(b). As a result, the IRS improperly assessed the second-tier tax against the Zabolotnys pursuant to § 4975(b). Because we conclude that the correction occurred by the end of the first taxable year, the Zabolotnys are properly liable for the first-tier 5% tax on the amount involved in the prohibited transaction for the taxable year 1981 only. *See* 26 U.S.C. § 4975(f)(2).

Accordingly, we affirm the imposition of the first-tier § 4975(a) tax in the amount of $324,095.75 for the taxable year 1981. We reverse the imposition of the first-tier § 4975(a) for each taxable year from 1982 to 1986 and the imposition of the second-tier § 4975(b) tax.