In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2600

Linda Williams,

Plaintiff-Appellant,

v.

Allen Jaglowski and Ronald Kelly,

Defendants-Appellees.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 8850--Rebecca R. Pallmeyer, Judge.

Argued February 16, 2001--Decided October 15, 2001

   Before Easterbrook, Manion, and Diane P.
Wood, Circuit Judges.

   Diane P. Wood, Circuit Judge.  On April
30, 1996, Essex Adams died in an apparent
suicide. Linda Williams, his girlfriend
and a suspended Chicago police officer,
arrived at the scene shortly after
Adams's death. Police at the scene tried
to question Williams about the death, but
she was evasive and refused to provide
even basic identifying information such
as her date of birth. Her uncooperative
attitude led the police at the scene to
arrest her for obstructing a police
officer in his official duties. Williams
was taken into custody and detained for
approximately ten hours. Several weeks
later, the charges against Williams were
dropped. She then filed this sec. 1983
action against the officers responsible
for her arrest and detention, arguing
that they lacked probable cause to arrest
her. The district court found that the
officers had at least arguable probable
cause for the arrest and so were entitled
to qualified immunity. The court granted
summary judgment for the defendants on
this basis, and we affirm.
I

   In the early morning hours of April 30,
1996, Williams was on the telephone with
Adams when she heard a sound at the other
end like a gun being fired, followed by

silence. She promptly called 911 and reported the incident, and police officers were dispatched to Adams's apartment. When the officers arrived, Adams's brother Henry let them into the apartment, where the officers discovered that Adams had been shot in the head and that a gun was lying on the floor near him. The officers realized that suicide was one possible explanation, but the position of the gun and Henry Adams's statement that Essex had not been depressed made them suspect foul play.

Shortly after the police arrived, Williams showed up at the apartment. Detective Allen Jaglowski, one of the officers investigating the death, knew that someone named Williams had made the original 911 call. Henry Adams had also informed Jaglowski that Essex had been dating a Chicago police officer named Linda Williams. Based on this information, Jaglowski began an interview of Williams and asked her for her badge and police ID. Williams replied that she did not have these items, but she refused to elaborate. In fact, Williams did not have a badge and ID because she was on suspension pending her discharge, but she did not share that information with Jaglowski. Jaglowski also asked Williams for her address. Initially, she refused to provide it, but she eventually relented and told him. Jaglowski next asked Williams for her date of birth. He did so because he regarded "Linda Williams" as a very common name, and he thought that the police department might need more information to verify Williams's identity and to confirm that she was a police officer. This request was apparently the last straw for Williams: she refused to give her date of birth, stating that she thought it was irrelevant.

After Williams refused to provide her date of birth, Jaglowski brought over a police sergeant, in uniform, who ordered Williams to answer Jaglowski's questions about her identity. Williams refused. Jaglowski consulted with the other officers at the scene and then warned Williams that she would be arrested if she did not provide the information. Williams continued to stonewall, and Jaglowski arrested her on a charge of obstructing a police officer in the performance of his official duties.

When the officers transported Williams to the police station, Lieutenant Ronald Kelly, the watch commander, spoke with Jaglowski and the other officers involved in the investigation concerning the circumstances of Williams's arrest. Lieutenant Kelly questioned Williams and told her that she had to answer the officers' questions concerning her identity. Williams remained adamant that she would not provide her date of birth, although she did give Kelly her star number, which enabled him to confirm that she was a suspended police officer. After consulting with Jaglowski and the other officers, Kelly approved the charges against Williams.

These charges were eventually dropped, but the fact remained that she had been detained for about ten hours before her release. She brought this sec. 1983 action against Detective Jaglowski and Lieutenant Kelly alleging that they lacked probable cause to arrest her.

II

Whether police officers had probable cause to arrest a suspect and whether they are entitled to qualified immunity for the arrest are closely related questions, although qualified immunity provides the officers with an "additional layer of protection against civil liability" if a reviewing court finds that they did not have probable cause. Hughes v. Meyer, 880 F.2d 967, 970 (7th Cir. 1989). In an unlawful arrest case in which the defendants raise qualified immunity as a defense, this court will "determine if the officer actually had probable cause or, if there was no probable cause, whether a reasonable officer could have mistakenly believed that probable cause existed." Humphrey v. Staszak, 148 F.3d 719, 725 (7th Cir. 1998). If the officers can establish that they had "arguable probable cause" to arrest the plaintiff, then the officers are entitled to qualified immunity, even if a court later determines that they did not actually have probable cause. Id. Accordingly, we will affirm the district court's grant of summary judgment if we find that "a reasonable police officer in the same circumstances and with the same knowledge . . . as the officer in question could have reasonably believed

that probable cause existed in light of well-established law." Id.

A.

The defendants' principal argument is that they had at least arguable probable cause to arrest Williams for obstructing a police officer, and thus qualified immunity bars this suit. "Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." Michigan v. DeFillippo, 443 U.S. 31, 36 (1979). Federal law asks only whether the officers had probable cause to believe that the predicate offense, as the state has defined it, has been committed. Richardson v. Bonds, 860 F.2d 1427, 1432 n.4 (7th Cir. 1988). Here, the relevant state law is 720 ILCS sec. 5/31-1(a), which defines the offense of obstructing a police officer. It reads in relevant part as follows: "A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his official capacity commits a Class A misdemeanor." In interpreting this statute, the Illinois Supreme Court has held that sec. 5/31-1 "do[es] not proscribe mere argument with a policeman about the validity of an arrest or other police action, but proscribe[s] only some physical act which imposes an obstacle which may impede, hinder, interrupt, prevent or delay the performance of the officer's duties, such as going limp, forcefully resisting arrest or physically aiding a third party to avoid arrest." People v. Raby, 240 N.E.2d 595, 599 (Ill. 1968). The defendants do not point to any physical act Williams committed that would satisfy the requirement set out in Raby. Moreover, as far as the record reveals, Williams did not engage in any physical act that in any way hindered or impeded Detective Jaglowski. Her only offense was stubbornly to refuse to supply Detective Jaglowski with her date of birth, which would not constitute obstruction as the Illinois Supreme Court defined that offense in Raby. Unless the circumstances of this case somehow bring it outside the Raby rule, the defendants did not have even arguable probable cause to arrest Williams for obstructing a police officer.

The defendants argue that Illinois cases

since Raby have called the Raby rule into question. We are not so sure. Our own analysis of the cases the defendants cite along with other recent Illinois decisions indicates that the "physical act" requirement is still very much an element of the crime of obstructing a police officer in Illinois. Since Raby, the Illinois Appellate Court has reaffirmed that a "physical act" is an essential element of obstruction under sec. 5/31-1, and has further clarified that, under Raby, "mere silence" in the face of requests for identifying information, or even supplying false information, is not enough to constitute obstruction. See People v. Ramirez, 502 N.E.2d 1237, 1239-40 (Ill. App. Ct. 1986) (false information); People v. Weathington, 394 N.E.2d 1059, 1061-62 (Ill. App. Ct. 1979) (mere silence). This court, following those cases, has also recognized that "in Illinois the crime of resisting an officer in the performance of his duty requires physical resistance." Ryan v. County of DuPage, 45 F.3d 1090, 1093 (7th Cir. 1995).

The cases that the defendants claim call the Raby holding into question have been distinguished by the Illinois courts. Two involve a defendant refusing to identify himself or giving false information to officers attempting to serve process on the defendant. People v. Meister, 682 N.E.2d 306, 309 (Ill. App. Ct. 1997); Migliore v. County of Winnebago, 321 N.E.2d 476, 479 (Ill. App. Ct. 1974). The Illinois courts have been clear that these cases involve concerns unique to the service of process context and do not apply to police investigations. See, e.g., Weathington, 394 N.E.2d at 1061 (distinguishing Migliore on this basis). The final case on which the defendants rely, People v. Gibbs, 253 N.E.2d 117, 119-20 (Ill. App. Ct. 1969), involved a defendant who interrupted an encounter between police and third parties, advised the third parties that they did not have to allow the police to search them, and urged the third parties to leave the area. Although this case offers some support for the idea that verbal interference alone could be sufficient to support a finding of obstruction in some cases, the Appellate Court has made it clear that Gibbs involved "unusual facts" and did not undermine the general rule stated in Raby. Ramirez, 502 N.E.2d at

1239. In this case, nothing Williams did interfered with the police officer's interactions with any third parties. In light of this well established law, we conclude that a reasonable officer could not have thought the situation fit within the narrow exception Gibbs created to the Raby rule, nor that even arguable probable cause existed to support an arrest of Williams for the offense of ob structing a police officer.

B.

This does not, however, win the day for Williams. The fact that the officers lacked probable cause to arrest her for the precise offense with which she was charged is only one part of our inquiry. Police officers are not required to be legal scholars. This means, among other things, that the arresting officer's knowledge of facts sufficient to support probable cause is more important to the evaluation of the propriety of an arrest than the officer's understanding of the legal basis for the arrest. Biddle v. Martin, 992 F.2d 673, 676 (7th Cir. 1993), citing Richardson v. Bonds, 860 F.2d 1427 (7th Cir. 1988). This is why an arrest is justified if the officers had probable cause (or arguable probable cause) to arrest the suspect either for the precise offense the officers cited or for a closely-related offense. Id. In order to rely on a closely-related charge, however, the officers must show that the charge can reasonably be based on the same set of facts that gave rise to the arrest and that the charge offered as justification is one that "would [have recommended] itself to a reasonable police officer acting in good faith" at the time the arrest was made. Richardson, 860 F.2d at 1431. The justification for the arrest cannot be an "ex post facto extrapolation [ ] of all crimes that might have been charged on a given set of facts." Id.

Jaglowski and Kelly argue that, even if they lacked probable cause to arrest Williams for obstructing a police officer, they had probable cause, or at least arguable probable cause, to arrest her on the closely-related charge of failure to follow police rules. If failure to follow police rules is a criminal offense at all (which we discuss in a moment), it is one that is "closely

related" on the present facts to the charge of obstructing an officer. We turn then to the critical question, which is whether state law defines the rules violation as a criminal offense, see DeFillippo, 443 U.S. at 36, or if the police rules are more like a schoolteacher's admonition not to run in the halls--a rule, to be sure, but nothing so dignified as a criminal law of the state.

Although it is not entirely clear that a Chicago police officer's failure to follow police rules could violate a state criminal law, it appears likely that this is the case. At the very least, we find that the law is unsettled, which means that the defendants here had at least arguable probable cause to arrest Williams, and any remaining question about the propriety of the arrest raises only an issue of state law, not a federal constitutional problem. No Illinois court has ever considered this question. Nevertheless, the Chicago Municipal Code (a "state" law for this purpose) specifies that Chicago police officers have the power to arrest for any violation of the Code. Chicago Mun. Code sec. 2-84-230. Another section of the Municipal Code provides:

Any member of the police department who shall neglect or refuse to perform any duty required of him by . . . the rules and regulations of the department of police . . . may, in addition to any other penalty or punishment imposed by law, be fined not more than $100.00 for each offense.

Id. sec. 2-84-290.

In a case with striking similarities to this one, we held that this provision incorporated the police rules into the Chicago Municipal Code. See Richardson, 860 F.2d at 1432 (finding police had arguable probable cause to arrest off-duty officer for refusal to provide his name and star number in violation of police rules). This implied that a violation of the police rules amounts to a violation of the Municipal Code, and an arrest may be made if probable cause exists. Although both parties admit that arrests for failure to follow police rules are highly unusual (in fact, at oral argument the City conceded that it

was not aware of any such arrests other than the ones at issue in Richardson and this case), the Chicago Municipal Code has not changed materially since we decided Richardson, and no Illinois case since then has cast doubt on our conclusion that the Chicago police have the authority to arrest fellow officers for this type of a violation of the Municipal Code.

The Supreme Court has recently held that arrests for misdemeanor violations that would be punishable only by a fine do not offend any constitutional principles. Atwater v. City of Lago Vista, 121 S. Ct. 1536 (2001). Atwater held that "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." 121 S. Ct. at 1557. Municipal Code sec. 2-84-290 describes just such a minor criminal offense. Since a failure to follow police rules is at least potentially a violation of that section of the Municipal Code, Atwater indicates that such an arrest would be constitutional. The only remaining issue is whether the officer had probable cause to believe that Williams had committed that offense in his presence.

In our opinion, he did. At the time of Williams's arrest, Detective Jaglowski had information that Williams was a police officer, and he knew that she had refused to answer his questions about her identity even after having been ordered to do so by a superior officer. These facts formed the basis for the obstruction arrest, and the same facts would support a charge of failure to follow police rules. Kelly testified that Williams's status as a police officer and her failure to follow police rules played at least some role in the decision to charge her, which reassures us that this justification is not an ex post facto excuse for the arrest. Moreover, the undisputed evidence in the record establishes that Williams violated at least one police rule in the presence of the arresting officer. Police Rule 6 prohibits disobedience of a written or oral directive of a superior officer. Williams was ordered by a uniformed sergeant, who was superior to her, to provide her date of birth to Detective

Jaglowski, and she refused to obey. Although Kelly and Jaglowski also argue that Williams violated a number of other police rules, we find it unnecessary to determine whether her conduct violated those other rules because the Rule 6 violation is clear. That is enough to support the district court's conclusion that Williams suffered no deprivation of her federal rights when she was arrested.

Williams makes two final arguments that need not detain us long. First, she argues that, regardless of whether an active police officer could be arrested for violating the police rules, she was on suspension at the time of her arrest, and suspended officers cannot be arrested for violating police rules. This makes little sense, especially on the facts of our case. Williams admits that she did not tell Jaglowski she was on suspension, and, as far as the record reveals, theofficers did not discover this information until after Williams was arrested and transported to the station. Because the probable cause analysis focuses on the information that was available to the arresting officer at the time of the arrest, see Humphrey, 148 F.3d at 725, the fact that, unbeknownst to the arresting officers, Williams was on suspension at the time of her arrest is irrelevant to our analysis. Moreover, Williams has not pointed to any police rule, municipal ordinance, or case suggesting that the police rules are not fully applicable to suspended officers. In the face of such silence, a reasonable officer could easily believe that, if active officers could be arrested for violating police rules, suspended officers could also be arrested for the same infractions.

Finally, Williams argues that applying Police Rule 6 to require her to answer Jaglowski's questions, under threat of arrest, violates her Fifth Amendment right not to be compelled to incriminate herself. Although it is possible that a rule requiring police officers to answer a superior officer's questions on pain of arrest might in some circumstances run afoul of the Fifth Amendment, we do not believe that Williams's Fifth Amendment rights are implicated here. The Fifth Amendment privilege allows people not to answer official questions if their answers "might incriminate [them] in

future criminal proceedings." Minnesota v. Murphy, 465 U.S. 420, 426 (1984). It seems highly unlikely that Williams would have incriminated herself in any way by providing Detective Jaglowski with her birth date, and Williams has not suggested any reason why this information might have proved incriminating. Cf. United States v. Edwards, 885 F.2d 377, 385 (7th Cir. 1989) (noting that Miranda warnings are not generally required before asking arrestees for "booking information" such as name and address because such information is not likely to evoke an incriminating response). In the circumstances of this case, Williams's Fifth Amendment argument has no merit.

For these reasons, we find that Detective Jaglowski and Lieutenant Kelly had at least arguable probable cause to arrest Williams for violating the Chicago Police Department's rules, and that they are entitled to qualified immunity on that basis. Accordingly, the judgment of the district court is Affirmed.