# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-2378

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

MARK A. REED,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 562-2—**Rebecca R. Pallmeyer**, *Judge.*

_____

ARGUED JANUARY 14, 2003—DECIDED NOVEMBER 13, 2003

_____

Before EASTERBROOK, RIPPLE, and ROVNER, *Circuit Judges.*

ROVNER, *Circuit Judge.* Mark Reed entered a conditional guilty plea to a charge of conspiracy to distribute in excess of 50 kilograms of marijuana, 21 U.S.C. §§ 846, 841(a)(1), preserving his right to appeal the denial of his motion to suppress confessions he made five or six hours after what he contends was an illegal arrest. Although the government argued that Reed was not arrested until well after he confessed, the district court, working under the assumption that Reed had been arrested illegally before he made his confessions, concluded that his confessions were admissible because they were sufficiently attenuated from the pur-

ported illegal arrest and thus were acts of Reed's own free will. We vacate that decision and remand for further consideration.

Around 2:30 p.m. on July 17, 2000, Reed was traveling south on Interstate 57 near Peotone, Illinois, in a pickup truck bearing Texas license plates and pulling a horse trailer. The truck's owner, Thomas Martin, was also in the truck, although a third man, Alfonso Garnica, was driving. In fact, Garnica was driving at a healthy clip. Illinois State Trooper C.G. Fifield, who at the time was conducting drug interdiction surveillance, clocked Garnica traveling at 63 m.p.h. Because Illinois restricts vehicles pulling trailers to 55 m.p.h., Fifield initiated a traffic stop. After checking Garnica's background on the computer terminal in his police cruiser, Fifield learned that Garnica's driving privileges had been suspended. Fifield placed Garnica under arrest for driving on a suspended license, but Garnica posted bond on the spot and was immediately released. Fifield then checked Reed's and Martin's backgrounds to determine whether either was permitted to drive. Fifield learned that both men had valid licenses, but he also learned that both had been arrested previously for drug-related crimes.

Upon learning this information, Fifield asked the three men what they were doing in Illinois. Reed explained that Martin had come to Illinois to finalize his divorce, and that he was assisting Martin because Martin was in poor health. Fifield asked Reed whether he was into horses, but Reed replied that he was not. Reed recollected that Martin then told Fifield essentially the same story but added that he also had come to Illinois to buy horses. Fifield on the other hand recalled that Martin told him only that they had come to buy horses. Fifield then became suspicious when neither Martin nor Garnica could explain where or from whom they had purchased the horses. And Fifield became even more

suspicious when he examined the exterior of the trailer and observed that its three entrances were padlocked, and that the rear ramp door was secured with three separate locks.

By this point, Martin had slid behind the wheel of the truck and was ready to drive away. Fifield claimed he told the three that they were free to leave, although Reed did not recall hearing him say this. Before they left, however, Fifield asked Martin whether there were any guns, drugs, or large quantities of cash in the vehicle. Martin said there was not, but Fifield asked for permission to search the truck and trailer. Martin consented. Fifield then directed Martin to drive to a nearby weigh station, where additional police awaited to assist in the search. The officers placed Reed, Martin, and Garnica in the weigh station building. At about 4:00 p.m., the officers discovered two pink cellophane-wrapped bundles containing $93,981 in United States currency hidden under some hay and plywood in the "gooseneck" of the horse trailer (the projecting front end of the trailer overlapping the truck bed). The officers then confronted Reed, Martin, and Garnica with the money and asked where it came from. Martin offered the curious explanation that the cash was the proceeds of an inheritance.

What transpired after this is significantly disputed. According to Reed, the police advised him that he was under arrest, placed him in handcuffs, transported him to State Police Headquarters, and read him *Miranda* warnings, which he acknowledged understanding by signing a form. The form indicates that Reed waived his rights at 4:19 p.m. Reed's claim that he was arrested around 4:00 p.m. was bolstered by an investigative report prepared by Special Agent Robert Babcock of the U.S. Customs Service. Babcock's report states that Reed, Martin, and Garnica were arrested immediately after the money was discovered in the trailer, and notes the time of Reed's arrest as 1600 hours.

In contrast to Reed's claims, Fifield asserted that Reed was neither arrested nor placed in handcuffs. Although he acknowledges that he gave Reed *Miranda* warnings, Fifield claimed that Reed accompanied him to police headquarters only "as a passenger." In support of Fifield's version of events, the government introduced Fifield's own police report, which contains no information indicating that Reed was arrested, but at the same time indicates that Garnica had been placed under arrest for driving on a suspended license. Fifield's testimony was also supported, somewhat surprisingly, by Babcock, who discredited his own report by claiming that he had no personal knowledge of what time Reed was arrested. Babcock claimed that he included the information about Reed's purported 4:00 p.m. arrest only because other police officers told him that Reed had been arrested at 4:00 p.m., and that he did not bother to check whether that information was accurate. Babcock blamed his failure to check the information in his report on time pressures and laziness.

After arriving at police headquarters sometime after 4:00 p.m., Reed recounted that his handcuffs (which Fifield insists he was not wearing) were removed, that he was placed in a conference room, and that he was not told that he was free to leave. At about 5:30 p.m., Officer Brian Hafner of the Bollingbrook, Illinois, Police Department, who was participating in the investigation as part of a multi-jurisdictional task force, entered the room and administered a second set of *Miranda* warnings. Reed again waived his rights. Reed and Hafner agree that at that point Hafner informed Reed that he was not under arrest, although Reed asserted that Hafner did not inform him that he was free to leave (Hafner does not remember). Reed then agreed to make a statement. Hafner, along with two other police officers and another Special Agent with the U.S. Customs Service interviewed Reed for approximately an hour, but Reed denied having any knowledge of the money found in

the trailer or any involvement in criminal activity. The officers then left Reed alone in the room. Hafner said he believed the conference room was unlocked at all times. Reed asserted that he does not know if this was true because he never attempted to leave. Reed claimed that he did not try to open the door because he believed he was under arrest, so that attempting to leave would have been interpreted by the police as an escape.

After Reed sat alone in the conference room for approximately 45 minutes, several officers returned and initiated further questioning. Reed continued to deny involvement in any criminal activity, but this time he spoke more freely about his companions, admitting that several weeks earlier he had seen Martin with a large amount of cash and that he had previously suspected that Martin was involved in some sort of criminal activity. The officers then left again, this time leaving Reed alone in the room until about 8:35 p.m., when additional officers arrived to take his fingerprints. Hafner claimed that at this point he told Reed he was free to go. Reed claimed he did not recall Hafner telling him this. Reed claimed, however, that at this point he had a change of heart brought about by his hours of "solitary down time" in the conference room reflecting on the kind of trouble he might be in. His solitary reflection led him to consider cooperating with the police in order to limit his criminal exposure (at the time, Illinois was prosecuting Reed for a controlled substance violation) and, so he thought, receive a reward for providing information about drug traffickers. Reed announced to Hafner that he had decided to cooperate fully, and offered to show him a ranch near Joliet, Illinois, where Reed claimed that he, Martin, and Garnica had delivered a shipment of marijuana earlier in the day.

At about 9:00 p.m., Reed left for Joliet with Hafner and several other police officers. Reed claimed he was hand-cuffed; Hafner claimed that Reed was not restrained. Dur-

ing the drive, Reed further admitted that he was aware that Martin and Garnica had obtained 100 kilograms of marijuana in Mexico and smuggled it into Texas. Reed said he had met up with Martin and Garnica in Texas, and that the three had driven the drugs to the ranch using the trailer. After Reed showed the police the ranch, Hafner returned him to police headquarters around 10:00 p.m., and he made additional incriminating statements. Hafner insists that it was only after this that Reed was formally placed under arrest.

Claiming that he had been unlawfully arrested shortly after 4:00 p.m. when the police discovered the money in the trailer, Reed moved to suppress his confessions as fruit of the poisonous tree. The district court denied his motion, however, concluding that under *Brown v. Illinois*, 422 U.S. 590, 602 (1975), his statements were admissible because they were sufficiently attenuated from any police misconduct so as to be considered a product of free will. In so ruling, the district court did not determine whether Reed had been arrested after the discovery of the money around 4:00 p.m., as he claimed, or after he finished making his confessions around 10:00 p.m., as the government claimed. The district court neither attempted to resolve the competing stories, nor assessed the credibility of Reed or the police officers. We review the district court's legal conclusions *de novo*, and its findings of fact for clear error. *United States v. Yang*, 286 F.3d 940, 944 (7th Cir. 2002).

The initial questions presented to the district court were whether the arrest occurred at 4 p.m. or at 10 p.m., and whether the arrest was illegal because it was not based on probable cause. Courts recognize that police officers need not be legal scholars, and therefore "the arresting officer's knowledge of the facts sufficient to support probable cause is more important to the evaluation of the propriety of an arrest than the officer's understanding of the legal basis for the arrest." (citations omitted) *Williams v. Jaglowski*, 269

F.3d 778, 783 (7th Cir. 2001). Accordingly, an arrest may satisfy the Fourth Amendment if there was probable cause to arrest the suspect for the precise offense the officer cited or, lacking that, for a "closely related charge." *Id.*; *Driebel v. City of Milwaukee*, 298 F.3d 622, 644 (7th Cir. 2002). In order to rely on a closely-related charge,

> the officers must show that the charge can reasonably be based on the same set of facts that gave rise to the arrest and that the charge offered as justification is one that "would [have recommended] itself to a reasonable police officer acting in good faith" at the time the arrest was made. [*Richardson v. Bonds*, 860 F.2d 1427, 1431 (7th Cir. 1988).] The justification for the arrest cannot be an "ex post facto extrapolation [ ] of all crimes that might have been charged on a given set of facts." *Id.*

*Williams*, 269 F.3d at 783. The district court did not make the probable cause determination in this case, finding only that the officers claim of probable cause was "not frivolous." Moreover, the government does not argue that we should find probable cause as a matter of law based on the fact findings before us, as the dissent suggests. Instead, the government contends that we should remand the case for a determination of probable cause if we cannot resolve it on the other issue in the case. We agree that the issue cannot be determined as a matter of law in this appeal, and therefore turn to the issue argued in the briefs, which is whether the confession was an unconstitutional by-product of the (presumably) illegal arrest.

A confession obtained through custodial interrogation after an illegal arrest must be excluded from evidence unless the confession is attenuated enough from the illegal arrest that the confession is "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois, supra*, 422 U.S. at 602 (quoting *Wong Sun v. United States*, 371 U.S.

471, 486 (1963)); *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990). Under *Brown*, the threshold requirement for admission is that the confession must have been voluntary for purposes of the Fifth Amendment. If so, we must then consider the temporal proximity of the illegal conduct to the statements, the presence of any intervening circumstances, and, most importantly, the purpose and flagrancy of the police misconduct. *Brown*, 422 U.S. at 603-04; *Dunaway v. New York*, 442 U.S. 200, 218 (1979); *Rawlings v. Kentucky*, 448 U.S. 98, 106-07 (1980); *Taylor v. Alabama*, 457 U.S. 687, 690 (1982). The burden of proving attenuation rests with the prosecution. *Brown*, 422 U.S. at 603-04.

We have little difficulty agreeing with the district court that Reed's confessions were voluntary. He twice received *Miranda* warnings and each time acknowledged and waived his rights, and he testified at the suppression hearing that the impetus for his decision to cooperate was his own self-interest, namely the possibility of resolving his pending state criminal charges and receiving a reward. But although voluntariness is an important factor in the attenuation analysis, it is not dispositive. *Brown*, 422 U.S. at 603-04; *Taylor*, 457 U.S. at 690.

Next, we consider the temporal proximity of the statements to the illegal arrest. The parties agree that Reed made his statements five to six hours after being taken into custody. The district court concluded that this length of time favored suppression, "but only slightly." Although this case involves more time than in *Brown*, 422 U.S. at 604-05 (two hours), it involves about the same amount of time as in *Taylor*, 457 U.S. at 691 (six hours), where, like *Brown*, the statements were excluded. Nevertheless, there is no "bright-line" test for temporal proximity. *See Taylor*, 457 U.S. at 691; *Fazio*, 914 F.2d at 958 & n.11; *see also Dunaway*, 442 U.S. at 220 (Stevens, J., concurring) ("the temporal relationship between the arrest and the confession

may be an ambiguous factor"); *Taylor*, 457 U.S. at 700 n.6 (O'Connor, J., dissenting) (illegal arrest can be exploited by a lengthy detention as easily as a brief detention). Indeed, in *Rawlings*, the Court held that a confession made only 45 minutes after an illegal arrest was admissible. 448 U.S. at 107-08. Accordingly, to draw any conclusions from timing of Reed's confessions, we must consider the temporal proximity factor in conjunction with the presence of intervening circumstances. *See Fazio*, 914 F.2d at 958.

The district court found no significant intervening circumstances present in this case which would purge the taint of the allegedly illegal arrest. The government urges us to focus on Reed's concessions that he twice received *Miranda* warnings and that he made his choice to cut his losses and look out for his self-interest after a period of "solitary down time" and reflection. But the Supreme Court rejected this argument in both *Brown*, 422 U.S. at 605, and *Taylor*, 457 U.S. at 690, stating that *Miranda* warnings by themselves do not suffice to purge the taint of an illegal arrest. That is because the question is not simply whether Reed's confessions should have been excluded as involuntary under the Fifth Amendment (where *Miranda* warnings are relevant). Rather, the question is whether the confessions should have been excluded under the Fourth Amendment as the product of an illegal arrest. The exclusionary rule, when used to effectuate the Fourth Amendment, serves interests and policies distinct from those it serves under the Fifth Amendment. *See Taylor*, 457 U.S. at 690-91. The government also directs our attention to the lack of evidence of any attempts by the police to exploit the illegal arrest, noting that Reed's interrogation was conducted in a non-confrontational manner. We are not persuaded. The type of intervening events that serve to attenuate official misconduct are those that sever the causal connection between the illegal arrest and the discovery of the evidence.

*See Wong Sun*, 371 U.S. at 491 (confession was made several days after illegal arrest and was preceded by arraignment and release from custody); *Rawlings*, 448 U.S. at 108-09 (discovery of other incriminating evidence implicating the defendant and causing the defendant to confess spontaneously); *Fazio*, 914 F.2d at 958 & n.12 (defendant freely agreed to speak to police at site away from scene of illegal arrest and drove his own vehicle to the meeting); *United States v. Green*, 111 F.3d 515, 521 (7th Cir. 1997) (proper arrest on unrelated charges following initial illegal arrest); *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1300 (9th Cir. 1988) (defendant's subsequent release from custody, appearance before magistrate judge, discussions with counsel, or subsequent convictions on unrelated charges). Under the circumstances of this case, the non-confrontational interviews between Reed and the police and Reed's periods of solitary reflection did not constitute significant intervening events suggesting that his subsequent confession was attenuated from his unlawful arrest. The district court properly concluded that there were no intervening circumstances sufficient to purge the taint of the allegedly illegal arrest.

The final factor in the *Brown* analysis—the purpose and flagrancy of the official misconduct—is considered the most important because it is tied directly to the rationale underlying the exclusionary rule, deterrence of police misconduct. *Brown*, 422 U.S. at 600; *United States v. Ienco*, 182 F.3d 517, 526 (7th Cir. 1999); *Fazio*, 914 F.2d at 958. The district court found no evidence that the police improperly exploited any illegal arrest or acted in "bad faith." In so holding, however, the district court appears to apply an unduly narrow interpretation of this factor. In determining the purpose and flagrancy of the official misconduct, the district court held that the factor weighed against suppression because Reed's interrogation was conducted congenially and

the police judiciously administered *Miranda* warnings, suggesting that the manner of the illegal arrest and subsequent interrogation was not "calculated to cause surprise, fright, or confusion." *E.g.*, *Brown*, 422 U.S. at 605. But that inquiry, although relevant, is not complete, because "purposeful and flagrant" misconduct is not limited to situations where the police act in an outright threatening or coercive manner similar to what occurred in *Brown. See Dunaway*, 442 U.S. at 218-19 (rejecting attempt to distinguish *Brown* on the grounds that the police did not threaten or abuse the defendant, and were highly protective of the defendant's Fifth and Sixth Amendment rights). In both *Dunaway* and *Taylor* the police interrogated the defendants without incident, and yet the Court held that the actions of the police still had the sort of "quality of purposefulness" condemned in *Brown. See, e.g., Dunaway*, 442 U.S. at 218. Although *Rawlings* emphasized the congenial atmosphere surrounding the defendant's interrogation, that case contained a significant intervening circumstance severing the casual connection between the illegal arrest and the confession that this case lacks. Conducting a custodial interrogation after an illegal arrest in a congenial and non-threatening manner does not in and of itself disprove that the police acted in bad faith. Unwarranted detentions following illegal seizures may demonstrate the type of purposeful and flagrant conduct the exclusionary rule was designed to prevent, especially if the police lack an arguable basis for the detention. *See Ienco*, 182 F.3d at 528; *United States v. Butler*, 223 F.3d 368, 376 (6th Cir. 2000); *United States v. Twilley*, 222 F.3d 1092, 1097 (9th Cir. 2000); *United States v. Miller*, 146 F.3d 274, 280 (5th Cir. 1998); *United States v. Thompson*, 712 F.2d 1356, 1362 (5th Cir. 1983); *see also Brown*, 422 U.S. at 603 (intervening discovery of probable cause cannot assure in every case that the Fourth Amendment violation has not been unduly exploited). Without probable cause to believe that a crime has

been committed, the police may not simply seize a person and hope that over time and after "reflection" the person decides to cooperate. *Dunaway*, 442 U.S. at 218 (quoting *Brown*, 422 U.S. at 605) ("arrest without probable cause had a 'quality of purposefulness' in that it was an 'expedition for evidence' admittedly undertaken in the hope that something might turn up"). This was the essential point of *Brown*, *Dunaway*, and *Taylor*. In fact, the *Brown* Court recognized that "the quality of purposefulness" can be demonstrated when the arrest, in design and execution, is investigatory in nature.

Therefore, in addition to examining whether the officer's actions were coercive or calculated to cause surprise, fright or confusion, the district court also must examine whether the actions were undertaken in an effort to advance the investigation or to embark on a fishing expedition in the hopes that it would lead to a confession or other useful evidence. Such actions would undermine the purpose of the Fourth Amendment, and therefore are relevant to this analysis that ultimately examines whether suppression is necessary for purposes of deterrence or judicial integrity. Because that determination involves issues of fact as well as law, they are more properly addressed by the district court in the first instance.

The dissent opines that Reed would have confessed even if he had been allowed to go home rather than being held for hours, because his confession stemmed from a desire to win favor and reward and was not a consequence of the illegality. We cannot make that determination as a matter of law, and the government has the burden to prove that his confession was attributable to a factor other than the prolonged detention following the allegedly illegal arrest. That Reed determined it was in his best interest to cooperate does not somehow divorce his decision from the unlawful detention. A person who believes that he has been arrested and who experiences a prolonged detention may

well have a different view of what is in his "best interest" than someone allowed to leave who is making that decision in his own home. We cannot hold as a matter of law that the confession in the former circumstance is attenuated enough from the illegal arrest that the confession is "sufficiently an act of free will to purge the primary taint." *Brown v. Illinois, supra*, 422 U.S. at 602 (quoting *Wong Sun v. United States*, 371 U.S. 471, 486 (1963)); *United States v. Fazio*, 914 F.2d 950, 957 (7th Cir. 1990). That determination turns ultimately on the district court's resolution of the factors set forth above, considered in light of our analysis here.

As was mentioned, all of this presupposes that Reed in fact was arrested without probable cause around 4:00 p.m., just after the police discovered the money in the trailer, as he contended and the district court assumed. A separate issue is whether Reed accompanied the police to headquarters voluntarily and was arrested only after he decided to cooperate and made his confession, as the government argued in the district court. Although the parties litigated these questions, the district court made no findings as to when the police arrested Reed. The judgment of the district court is VACATED, and the case is REMANDED for further proceedings consistent with this opinion.

EASTERBROOK, *Circuit Judge*, dissenting. Police stopped, for speeding, a pickup truck pulling a horse trailer. They discovered that Alfonso Garnica, the driver, did not have a valid license. Before allowing the truck and its occupants to

proceed, the police needed to find out whether one of the passengers (Thomas Martin and Mark Reed) was legally entitled to drive. A computer check revealed that they were—and that both also have criminal records as drug dealers. None of the trio could explain where the horses in the trailer had come from or what they were planning to do with the animals. Martin said that he had purchased them but couldn't remember where or from whom. Horse trailers are a popular way to move marijuana, because they have room to hide that bulky substance and the horses' odor masks its smell. See *United States v. Torres*, 32 F.3d 225 (7th Cir. 1994); see also *United States v. Portales*, No. 01-4001 (7th Cir. Nov. 22, 2002) (unpublished order). Suspicions aroused, the officers asked Martin, who owned the truck, to permit a search; he agreed. Officers found two bundles hidden under the floor of the trailer and covered by bales of hay. The bundles contained about $94,000 in currency wrapped in pink cellophane. Martin called this a recent inheritance from his mother's estate. At the stationhouse, Reed concluded that he was in hot water and that his best hope of extrication lay in switching sides. He then revealed the trio's drug dealings. When he learned that assistance did not *fully* exonerate him, Reed moved to suppress his statement and all evidence based on it.

In the district court, the parties debated three questions: first, when was Reed arrested (before the trip to the stationhouse, as he insists, or only after his confession, as the prosecutor contends)?; second, if the arrest preceded the confession, was it supported by probable cause?; third, if the arrest was not supported by probable cause, is the confession admissible as "an act of free will [sufficient] to purge the primary taint of the unlawful invasion"? *Wong Sun v. United States*, 371 U.S. 471, 486 (1963). See also *Kaupp v. Texas*, 123 S. Ct. 1843, 1847 (2003); *Brown v. Illinois*, 422 U.S. 590 (1975). Pretermitting the first two, the district

judge concluded that Reed's statement, made about six hours after he arrived at the stationhouse, stemmed from a desire to win favor and reward and was not a consequence of any illegality. This implies that Reed would have reached the same conclusion, and given the same information eventually, if he had been allowed to go home right after the officers seized the cash; Reed still would have known that the police were onto him and still would have wanted to reduce his criminal exposure. Most of Reed's time had been spent in an empty and unlocked room, the judge found; there is no doubt that his statement was the result of free will. Moreover, the judge concluded— and this is a finding of fact—that the police had acted in good faith and had not sought to round up the occupants without probable cause in the hope that, if held long enough, they would inculpate themselves. This led the district judge to deem the statements admissible.

Multi-factor-balancing tests of the sort *Brown* created pose tough issues for district judges. The appellate role, by contrast, is limited to determining whether a clear error has been committed. *Brown* said as much. Immediately after listing the principal considerations that should inform the analysis, the Court added: "Our approach relies heavily, but not excessively, on the 'learning, good sense, fairness and courage of federal trial judges.' *Nardone v. United States*, 308 U.S. 338, 342 (1939)." 422 U.S. at 604 n.10. This means that we must review the district court's resolution deferentially and must remand (if the district judge left some stones unturned) rather than make our own findings; otherwise the Court would have said that it was relying on the learning, etc., of appellate judges.

I do not think that the district judge made any clearly erroneous finding or abused her discretion in balancing the factors. *Brown* said, and my colleagues reiterate, that the most important consideration is whether the police have acted in bad faith by reeling in suspects without colorable

justification. At 5:30 p.m., well before Reed confessed, the police told him point blank that he was *not* under arrest; this is not the behavior of officers determined to hold someone until he cracks. What is more, in both *Brown* and *Kaupp* the police lacked *any* cause to arrest, let alone do so at a person's home: both Brown and Kaupp were snatched in handcuffs from their residences. Here the intrusion is smaller and the justification greater. At a minimum, the police had probable cause to believe they had probable cause. Cf. *Hunter v. Bryant*, 502 U.S. 224, 228 (1991) (right question for qualified immunity from damages is whether "a reasonable officer could have believed that probable cause existed"). Perhaps the district judge failed to spell out the thinking behind some of her conclusions (such as the proposition that Reed would have confessed eventually even if not in custody), but I think the judge's assessment sufficiently straightforward that remand is unnecessary.

Indeed, the whole "fruits" inquiry is unnecessary, for the police *had* probable cause. Although application of the *Brown* factors is reviewed deferentially on appeal, probable cause is assessed independently. See *Ornelas v. United States*, 517 U.S. 690 (1996). All findings of historical fact that influence the probable-cause decision have been made; what purpose could be served by a remand, when *Ornelas* requires us to disregard the district judge's disposition? And if I'm wrong about the existence of probable cause, it remains hard to see how police could be blamed for thinking that they had enough to act; resolution of a close question ought not imply that the losing side acted in wilful disregard of the law.

Before taking Reed to the stationhouse, officers knew that Reed and Martin had a history of drug dealing; that the trio had a conveyance that can be used to hide both the bulk and the odor of marijuana; that a hidden compartment in the trailer contained almost $100,000; and that Martin's

explanations for the money and the horses were not only implausible but also so lacking in detail (how could Martin not know where "his" horses had come from and where they were going?) that the most likely explanation was that someone else had furnished the trailer to conceal drugs and their purchase money. The police found proceeds rather than drugs. If this was not adequate to arrest the trio for distributing drugs (the crime to which Reed eventually confessed, telling the police that the trailer had been used to transport marijuana north and now was taking the receipts back south), it was more than enough to arrest them for money laundering. The local police may not have been able to name the federal crimes involved, but this is not necessary. See Wayne R. LaFave, 2 *Search & Seizure: A Treatise on the Fourth Amendment* §3.2(e) at 72 (3d ed. 1996) (collecting authority). Probable cause is determined objectively, based on all facts in the collective possession of the police. See, e.g., *Whren v. United States*, 517 U.S. 806 (1996). It is accordingly irrelevant what crime particular officers *thought* they were arresting for, or indeed whether they thought they were making an arrest at all. (Officers who don't believe that they are making an arrest may not have *any* offense in mind, but this too is beside the point when the inquiry is objective.) Nor should it matter how one offense is "related" to another. Drug transactions doubtless are related closely to money laundering. Most traffickers commit both, and it may be happenstance whether the police find the drugs before the sale, or the payment afterward. Still, opinions making something turn on relations among offenses are hard to reconcile with the Supreme Court's objective approach, so I'm loathe to pursue the link between drug and currency offenses.

Any currency transaction using the proceeds of a crime, and structured so as to avoid financial reporting requirements, constitutes money laundering under 18 U.S.C.

§1956(a)(1)(B)(ii), (a)(3)(C). The horse trailer contained more than nine times the trigger for reporting cash transactions. Conviction under §1956 would require proof of an illegal origin or use of the money, but the officers had reason to suspect this and probable cause is something well short of evidence required for conviction. See *Illinois v. Gates*, 462 U.S. 213, 235 (1983); *Beck v. Ohio*, 379 U.S. 89, 96 (1964). Reed was then awaiting trial on another drug charge; none of the occupants could explain where the horses had come from; and the explanation ("an inheritance") for the cash was risible. Executors of decedents' estates do not distribute bequests in pink cellophane. Likely the police had probable cause to arrest for any of a large number of offenses that people commit using packets of currency. The financial-structuring guideline, U.S.S.G. §2S1.3, offers a list. Some statutes make it a crime to structure *any* transaction to avoid reporting the transfer of more than $10,000 in cash. These have lower penalties than §1956 but also omit any need to show that the funds have an illegal genesis. So there was probable cause to arrest Reed as soon as the money came to light. Further proceedings in the district court would be bootless. And whether or not this analysis of probable cause is conclusive, it shows that the district court did not commit a clear error in finding that the officers acted in good faith.

A true Copy:

     Teste:


                   _____
                   *Clerk of the United States Court of*
                   *Appeals for the Seventh Circuit*