147 T.C. No. 14

UNITED STATES TAX COURT

PIZZA PRO EQUIPMENT LEASING, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13149-15.                    Filed November 17, 2016.

P adopted the Plan, a defined benefit pension plan, effective Jan. 1,
1995. The Plan was a qualified plan under I.R.C. sec. 401(a)
throughout the years at issue. At all relevant times, the Plan had a
single participant, P's president. The Plan's normal retirement age
was set at age 45. The Plan provided that the participant's accrued
benefits vested fully at death and were payable as a death benefit to
the participant's designated beneficiary.

The Plan filed Forms 5500, Annual Return/Report of Employee
Benefit Plan, for each of the plan years 2002 through 2006, which
coincided with the calendar year and the Plan's and P's tax years.
However, P never filed any Forms 5330, Return of Excise Taxes
Related to Employee Benefit Plans. R filed substitute Form 5330
returns on behalf of P for the years at issue and subsequently
determined deficiencies and additions to tax related to nonpayment of
the I.R.C. sec. 4972 excise taxes. R asserted that portions of P's
contributions to the Plan were nondeductible because the Plan's

funding did not fully account for the proper reductions imposed by I.R.C. sec. 415(b)(2)(C) for benefits beginning before age 62.

Held: R applied the correct method to reduce the maximum benefits under I.R.C. sec. 415(b)(2)(C) to an actuarially equivalent value for a retirement age before age 62 in the Plan where the Plan did not provide for forfeiture of the participant's benefits at death.

Held, further, P is liable for I.R.C. sec. 4972 excise taxes for nondeductible contributions made to the Plan for tax years 2002 through 2006 because portions of the total contributions made were in excess of I.R.C. sec. 404 limitations.

Held, further, P did not make a valid election under I.R.C. sec. 4972(c)(7) to disregard certain nondeductible contributions.

Held, further, P is liable for additions to tax under I.R.C. sec. 6651(a)(1) and (2) for failing to file Forms 5330 and pay excise taxes. P did not have reasonable cause for those failures.

Held, further, the statute of limitations does not bar the assessment and collection of I.R.C. sec. 4972 excise taxes for nondeductible contributions made to the Plan.

Samuel A. Perroni, for petitioner.

Peter J. Gavagan and Mark L. Hulse, for respondent.

## OPINION

LARO, <u>Judge</u>:  This case arises out of contributions made by petitioner in tax years 2002 through 2006 to a defined benefit pension plan called the Pizza Pro Equipment Leasing, Inc. Retirement Plan (plan).  The case was submitted fully stipulated for decision without trial.  <u>See</u> Rule 122.[1]

Respondent determined deficiencies in petitioner's Federal excise taxes due for tax years 2002 through 2006 as follows:

| Year | Deficiency | Additions to tax Sec. 6651(a)(1) | Sec. 6651(a)(2) |
|---|---|---|---|
| 2002 | $10,081 | $2,268.22 | $2,520.25 |
| 2003 | 19,401 | 4,365.22 | 4,850.25 |
| 2004 | 26,498 | 5,962.05 | 6,624.50 |
| 2005 | 25,269 | 5,685.52 | 6,317.25 |
| 2006 | 23,894 | 5,376.15 | 5,973.50 |

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code) applicable for the years at issue.  Rule references are to the Tax Court Rules of Practice and Procedure.

We decide the following issues:

(1)     whether petitioner applied the correct method to reduce the maximum benefits under section 415(b)(2)(C) for a retirement age before to age 62, where the plan does not provide for forfeiture of the participant's benefits at death.  We hold that it did not;

(2)     whether petitioner is liable for excise taxes under section 4972 for nondeductible contributions made to the plan for calendar years 2002 through 2006 because the contributions were in excess of the limitations imposed by section 404.  We hold that petitioner is so liable;

(3)     whether petitioner is liable for additions to tax pursuant to section 6651(a)(1) and (2) for failure to timely file Forms 5330, Return of Excise Taxes Related to Employee Benefit Plans, and failure to timely pay the excise taxes for calendar years 2002 through 2006.  We hold that petitioner is so liable and did not have reasonable cause for not filing Forms 5330 or not paying excise taxes for the years at issue;

(4)     whether the statute of limitations bars the assessment and collection of excise taxes pursuant to section 4972 for nondeductible contributions to the plan for calendar years 2002 through 2006.  We hold that it does not.

## Background

I.    Overview

The parties submitted this case fully stipulated under Rule 122.  The stipulations of fact and the facts drawn from stipulated exhibits are incorporated herein.  Petitioner is an Arkansas corporation maintaining a principal office in Cabot, Arkansas.  This case is appealable to the Court of Appeals for the Eighth Circuit absent stipulation of the parties to the contrary.

II.    The Pizza Pro Equipment Leasing, Inc. Retirement Plan

Petitioner adopted the plan, a defined benefit pension plan, effective January 1, 1995.  Petitioner did not fund a defined contribution plan during any of the years at issue in this case.  Respondent issued a favorable determination letter for the plan on September 23, 1997.  The plan has been timely amended as required by all legislation enacted after September 23, 1997, and throughout the years at issue continued to be a qualified plan pursuant to section 401(a).  Specifically, on December 18, 2001, petitioner amended the plan by adopting the Jewell, Moser, Fletcher & Holleman, A Professional Association, Prototype Defined Benefit Plan & Trust Basic Plan Document, which was in effect for the 2002 plan year.  Respondent on October 9, 2002, issued an opinion letter finding the form of the plan to be acceptable under section 401.  On November 28, 2003,

petitioner further amended the plan by adopting the Jewell Law Firm, P.A., Prototype Defined Benefit Plan & Trust Basic Plan Document, which was in effect for the 2003 through 2006 plan years. Respondent on July 31, 2003, issued an opinion letter finding the form of the plan to be acceptable under section 401.

Throughout the years at issue, the plan maintained a calendar year and a yearend valuation date. The plan had a single participant, Scott A. Stevens, who was also petitioner's president. Mr. Stevens further served as the plan's trustee.

The normal retirement age (NRA) set forth in the plan was the later of age 45 or the fifth anniversary of the participation date. Mr. Stevens was born in 1961. Since Mr. Stevens' reaching age 45 was the later of the two dates specified in the plan, the parties have stipulated that for purposes of this case the NRA is age 45. The normal retirement benefit of 100% of the participant's average annual compensation under the plan was to be paid in the form of a straight-life annuity. Section 7.5(a) of the plan required that a vested accrued benefit be paid "in the form of a qualified joint and survivor annuity."[2] Per section 6.3.2 of the plan, if a benefit was not a straight-life annuity, then the benefit "must be adjusted to an

_____

[2]Citations of specific plan and adoption agreement sections reflect those sections as they appear in the 2002 plan documents. Any amendments made on November 28, 2003, and effective for years 2003 through 2006, were minor and do not substantively affect our analysis.

actuarially equivalent straight life annuity" although no actuarial adjustment was needed for "the value of a qualified joint and survivor annuity" and "the value of benefits that are not directly related to retirement benefits (such as the qualified disability benefit, pre-retirement death benefits, and post-retirement medical benefits)". Under section 7.5(c)4 of the plan, a qualified joint and survivor annuity was

> [a]n immediate annuity for the life of the Participant with a survivor annuity for the life of the spouse which is not less than 50 percent and not more than 100 percent of the amount of the annuity which is payable during the joint lives of the Participant and the spouse and which is the actuarial equivalent of the normal form of benefit, or, if greater, an optional form of benefit. The percentage of the survivor annuity under the plan shall be 50% (unless a different percentage is elected by the employer in the Adoption Agreement).

Section 7.2 of the plan provided that a participant's accrued benefits are fully vested at the participant's death before his retirement date and payable as a death benefit to the participant's designated beneficiary. Under section 35 of the adoption agreement, the pre-retirement death benefit was calculated to be "[t]he qualified preretirement survivor annuity plus the excess, if any, of the present value of the participant's accrued benefit minus the present value of the qualified preretirement survivor annuity." Section 6.3.11(c) of the plan provided:

> If the benefit of a Participant commences prior to age 62, the Defined Benefit Dollar Limitation [as established under section 415(d)]

applicable to the Participant at such earlier age is an annual benefit payable in the form of a straight life annuity that is the actuarial equivalent of the Defined Benefit Dollar Limitation for age 62, as determined above, reduced for each month by which benefits commence before the month in which the Participant attains age 62. Effective for Limitation Years beginning on or after January 1, 1995, the Defined Benefit Dollar Limitation applicable at an age prior to age 62 is determined as the lesser of the actuarial equivalent of the Defined Benefit Dollar Limitation for age 62 computed using the interest rate and mortality table (or other tabular factor) specified in Section 36 of the Adoption Agreement [that is, a 5% interest rate and the G.E. Life Annuity Table with five-year setback], and the actuarial equivalent of the Defined Benefit Dollar Limitation for age 62 computed using a 5 percent interest rate and the applicable mortality table as defined in section 1.4 of the plan. Any decrease in the Defined Benefit Dollar Limitation determined in accordance with this provision (c) shall not reflect a mortality decrement if benefits are not forfeited upon the death of the Participant. If any benefits are forfeited upon death, the full mortality decrement is taken into account.

For plan years 2003 through 2006, the first sentence of section 6.3.11(c) instead read: "If the benefit of a Participant commences prior to age 62, the Defined Benefit Dollar Limitation applicable to the Participant at such earlier age is an annual benefit payable in the form of a straight life annuity beginning at the earlier age that is the actuarial equivalent of the Defined Benefit Dollar Limitation at age 62, as adjusted under (a) above, if required."

The plan actuary reviewed and approved actuarial valuation work papers including amortization schedules for plan years 1996 through 2002 and valuation

results for plan years 2002 through 2006. The plan actuary, an enrolled actuary, also signed Schedules B, Actuarial Information, to the Forms 5500, Annual Return/Report of Employee Benefit Plan, filed by the plan for each of the years at issue.

III.    Audit and Determination of Deficiency

The plan filed Form 5500 for each of the plan years 2002 through 2006. Petitioner did not file any Forms 5330 for any of the tax years 2002 through 2006.

Respondent had audited the plan in 1998 but closed the audit with no adjustments. However, respondent began another audit in late 2005.

On October 29, 2012, respondent filed on behalf of petitioner a substitute Form 5330 for each of the tax years 2002 and 2003, with an attached section 6020(b) certification. Respondent on February 28, 2013, filed a similar form on behalf of petitioner for each of the tax years 2004, 2005, and 2006.

Respondent on March 11, 2015, issued a notice of deficiency to petitioner for tax years 2002 through 2006, determining the deficiencies and additions to tax identified in the opening paragraphs above. In the notice of deficiency respondent determined that petitioner made nondeductible contributions to the plan because the funding did not fully account for the proper reductions imposed by section 415(b)(2)(C) for benefits beginning before age 62. The parties have stipulated the

following comparison of the maximum benefits allowable under section 415(b)

with the section 415(b)(2)(C) reduced benefit limits as determined by petitioner

and respondent, respectively:

| Year | Sec. 415(b) maximum | Petitioner | Respondent |
|------|---------------------|------------|------------|
| 2002 | $160,000 | $69,740 | $52,935 |
| 2003 | 160,000 | 69,687 | 53,150 |
| 2004 | 165,000 | 71,633 | 54,811 |
| 2005 | 170,000 | 74,170 | 56,472 |
| 2006 | 175,000 | 76,352 | 58,133 |

In view of his computation pursuant to section 415(b)(2)(C) of lower reduced

benefit limits, respondent in the notice of deficiency further calculated allowable

deduction limits. Since respondent computed lower benefit limits than did

petitioner, respondent arrived at lower section 404 deductible limits, resulting in

nondeductible contributions as follows:

| Year | Original contribution | Allowable amount | Excess contributions |
|------|-----------------------|------------------|----------------------|
| 2002 | $292,470 | $191,659 | $100,811 |
| 2003 | 263,817 | 170,620 | 93,197 |
| 2004 | 283,406 | 212,433 | 70,973 |

| 2005 | 225,352 | 237,641 | (12,289) |
| 2006 | 1,704 | 15,451 | (13,747) |

Applying the 10% excise tax of section 4972 on nondeductible contributions, and accounting for carryover of excess contributions until they are used up or removed from the plan, respondent calculated the following section 4972 excise tax amounts:

| Year | Excess contributions | Prior year carryover | Total | Sec. 4972 tax due |
|------|---------------------|---------------------|-------|-------------------|
| 2002 | $100,811 | -0- | $100,811 | $10,081 |
| 2003 | 93,197 | $100,811 | 194,008 | 19,401 |
| 2004 | 70,973 | 194,008 | 264,981 | 26,498 |
| 2005 | (12,289) | 264,981 | 252,692 | 25,269 |
| 2006 | (13,747) | 252,692 | 238,945 | 23,894 |

IV.   The Parties' Calculations of Retirement Benefit Present Values

The parties have stipulated the following calculations of present values of various pension plan payments, assuming: (1) an interest rate of 5.0%, (2) a life expectancy of 23.5 years for a person aged 62, and (3) a life expectancy of 38.8 years for a person aged 45.  The chart is subdivided into five segments, each

reflecting different assumptions as to the annual payments for life at ages 45 and 62:

| Annual payment for life | Beginning at age | Present value |
|---|---|---|
| $160,000 | 62 | $2,292,126 |
| 69,740 | 45 | 1,243,922 |
| 52,935 | 45 | 944,179 |
| 160,000 | 62 | 2,292,126 |
| 69,687 | 45 | 1,242,977 |
| 53,150 | 45 | 948,014 |
| 165,000 | 62 | 2,363,755 |
| 71,633 | 45 | 1,277,687 |
| 54,811 | 45 | 977,641 |
| 170,000 | 62 | 2,435,384 |
| 74,170 | 45 | 1,322,938 |
| 56,472 | 45 | 1,007,267 |
| 175,000 | 62 | 2,507,012 |
| 76,352 | 45 | 1,361,876 |
| 58,133 | 45 | 1,036,893 |

In determining the permissible normal retirement benefit under the plan each year, petitioner reduced the section 415 dollar limit by discounting the maximum benefit by 5% interest for the 17 years between age 62 and age 45--that is by applying a factor equal to $(1/1.05)^{17}$--to reach the present value at age 45 of the permissible benefit payable at age 62.

On the other hand, respondent for the 2002 tax year reduced the section 415 dollar limit not only by discounting the maximum benefit by 5% interest for the 17 years between age 62 and age 45 as petitioner had done, but also multiplying the resulting amount by 75.83%, a factor obtained by dividing the annuity purchase rate (APR)[3] at age 62 by the APR at age 45--that is, by dividing 12.45592 by 16.426--derived from the 1983 Group Annuity Mortality (GAM) blended table, which is the "applicable mortality table" from Rev. Rul. 95-6, 1995-1 C.B. 80. For tax years 2003 through 2006, respondent followed a similar calculation, except that he multiplied the resulting amount in the second step by 76.14%--a factor obtained by dividing 12.68 by 16.654--computed using the 1994 Group

---

[3]As Steven H. Klubock, respondent's expert, explains: "The annuity purchase rate is the present value of the series of payments for the employees life based on given interest and mortality." Its calculation, per Mr. Klubock, is based on the summation of the product of (1) payment, (2) discount for interest to payment, and (3) probability of living to receive payment (until the mortality table ends).

Annuity Reserving (GAR) blended table, which is the "applicable mortality table" from Rev. Rul. 2001-62, 2001-2 C.B. 632. The following table summarizes respondent's calculation of the section 415(b)(2)(C) limit at age 62 reduced to age 45 for each of the years at issue:

| Year | [1] Age 62 limit | [2] Interest discount for 17 years at 5% | [3] APR at age 62 | [4] APR at age 45 | [5] Age 45 limit |
|------|------|------|------|------|------|
| 2002 | $160,000 | 0.4363 | 12.456 | 16.426 | $52,936 |
| 2003 | $160,000 | 0.4363 | 12.68 | 16.654 | $53,150 |
| 2004 | $165,000 | 0.4363 | 12.68 | 16.654 | $54,811 |
| 2005 | $170,000 | 0.4363 | 12.68 | 16.654 | $56,472 |
| 2006 | $175,000 | 0.4363 | 12.68 | 16.654 | $58,133 |

Essentially, respondent applied a tripartite method to calculate the required reduction in the section 415 dollar limitation with respect to a retirement age earlier than 62.

(1) Determine the actuarial equivalent value of each year's respective limit payable at age 62 for life by converting that annual limit into a lump-sum value, assuming 5% interest and the probability of living each year to receive this

annual benefit, and multiplying the limit by the appropriate APR. In the table above, this requires multiplying [1] by [3].

(2) Reduce the value derived in the first step from age 62 to age 45 by discounting it for interest only for 17 years. In the table above, this entails multiplying [[1] × [3]] by [2].

(3) Convert the value derived in the second step to a life annuity payable at age 45. In the table above, this requires dividing [[1] × [2] × [3]] by [4], to arrive at the final number in [5].

## V. Petitioner's Income Tax Returns

Petitioner filed Forms 1120, U.S. Corporation Income Tax Return, for tax years 2002 through 2006. Throughout the years at issue, petitioner claimed the following deductions for contributions to the plan:

| Year | Contribution deducted |
|------|----------------------|
| 2002 | $292,470 |
| 2003 | 263,817 |
| 2004 | 283,406 |
| 2005 | 225,352 |
| 2006 | 1,704 |

On January 16, 2008, respondent issued a notice of deficiency with respect to petitioner's 2004 income tax return, disallowing a portion of petitioner's claimed deduction for contributions to the plan. Respondent determined a deficiency for the 2004 tax year of $38,871, plus interest of $9,253.55. Petitioner filed a petition with this Court on March 24, 2008. On March 3, 2010, this Court entered a stipulated decision in docket No. 7124-08, following petitioner's agreement with the deficiency determined by respondent.

On November 4, 2008, respondent issued another notice of deficiency, this time with respect to petitioner's 2005 income tax return, disallowing a portion of petitioner's claimed deduction for contributions to the plan. Respondent determined a deficiency for the 2005 tax year of $48,804. Petitioner filed a petition with this Court on December 4, 2008. On March 3, 2010, this Court entered a stipulated decision in docket No. 29393-08, following petitioner's agreement with the determined deficiency.

VI.  Expert Witnesses

Petitioner and respondent each sought to introduce one expert witness to opine on certain matters relevant to this case. Although experts ordinarily are proffered as witnesses at trial, there is precedent in this Court for allowing expert testimony to be submitted in fully stipulated cases. See, e.g., Alumax Inc. v.

Commissioner, 109 T.C. 133 (1997), aff'd, 165 F.3d 822 (11th Cir. 1999).  Here, the parties submitted their experts' reports as exhibits to the first stipulation of facts.

      A.    <u>Xiaoshen Wang, Ph.D.</u>

Xiaoshen Wang is a professor of mathematics at the University of Arkansas at Little Rock.  He received bachelor of science and master of science degrees in Mathematics from Jilin University in Changchun, China, and a Ph.D. in mathematics from Michigan State University.  Professor Wang has published many articles on various mathematical topics, with recent publications focusing on the field of numerical analysis.  Aside from foundational courses in trigonometry, algebra, calculus, and differential equations, Professor Wang has taught financial mathematics, numerical analysis, and number theory.  He is experienced in several computer languages and mathematical software programs.  Before joining the faculty of the University of Arkansas at Little Rock, Professor Wang served as a professor at the University of Central Arkansas and was an instructor at Michigan State University.  Professor Wang has not testified as an expert at trial or by deposition in any other cases during the previous four years.

Petitioner has offered Professor Wang's report in support of two propositions.  Firstly, Professor Wang opines that, as calculated by petitioner, the

present values of annual lifetime payments of certain amounts beginning at age 45 are less than the present values of coordinate annual lifetime payments of certain amounts beginning at age 62. His report includes the calculations and the facts and data used to determine the present values and to make comparisons. Secondly, Professor Wang in an addendum report opines on the present values of certain smaller annual lifetime payments beginning at age 45, as calculated by respondent. Professor Wang's addendum report includes his calculations and the facts and data used to determine the values.

Notwithstanding the inclusion of Professor Wang's report in the first stipulation of facts, respondent objected to the report on the grounds that Professor Wang is not a pension actuary, nor is he qualified to present expert testimony regarding the specific methodology required to calculate the requisite reduction for an early retirement age under section 415(b)(2)(C). Respondent further objected on the grounds that the report compares present values of annuities certain rather than life annuities, the latter of which are the specific subject of the present case. In his opening and answering briefs, respondent argues that Professor Wang's report should be disregarded for these reasons and certain errors contained therein. As we confront the questions presented in this case, we will

consider Professor Wang's report but give it no more than its due weight, as discussed below.

B.     Steven H. Klubock, F.S.A., E.A.

Steven H. Klubock is an actuary employed in the Tax Exempt and Government Entities Division of the Internal Revenue Service (IRS).  Mr. Klubock holds a bachelor of science, magna cum laude, in actuarial science from the College of Insurance in New York City.  He has been an enrolled actuary since 1980 and a fellow of the Society of Actuaries since 1982.  In the IRS' employ, nearly all of his work involves defined benefit pension plans, and his responsibilities include:  responding to taxpayers' requests for private letter rulings; providing technical assistance and writing publications; teaching and preparing training materials; assisting with the development of regulations, revenue procedures, and notices; updating annually the defined benefit schedules to Form 5500; rendering actuarial assistance on plan qualifications; and responding to questions from practitioners and IRS employees.  Before joining the IRS in 2009 Mr. Klubock spent 28 years working as an enrolled actuary at national actuarial consulting firms, where he prepared minimum funding requirements and maximum allowable tax deductions for defined benefit pension plans and performed benefit calculations under section 415(b).

Respondent introduced Mr. Klubock's report to establish three propositions. Firstly, Mr. Klubock opines that the limitations for defined benefit plans under section 415(b) were exceeded for the plan, resulting in contributions exceeding the allowable deductions for contributions to an employee's trust under section 404, subject to the 10% excise tax under section 4972. Secondly, he contends that the information provided on Forms 5500 by the plan could not possibly have allowed the IRS to determine that nondeductible contributions were made and that the only way the IRS could determine this would be by auditing of the data and calculations. Thirdly, Mr. Klubock opines that the contributions exceeded the plan's full funding limitation and that the plan's sponsor could have remedied the tax deduction excess either by electing not to deduct a portion of the contributions made or by electing a refund of the nondeductible contributions.

In addition to rendering his opinions, Mr. Klubock provides an overview of defined benefit plan funding, including aspects of plan design, the role of an enrolled actuary, the actuarial valuation process, and the applicable statutory and regulatory regime. He also critiques Professor Wang's expert report. Mr. Klubock furthermore concludes that the IRS actuary who participated in the audit of petitioner's returns was correct in her calculations of the actuarially equivalent values of amounts payable at ages 45 and 62 under the plan.

## Discussion

### I.   Overview

Even though the parties raise several issues in this matter, the key question upon which the case turns is whether respondent applied mortality adjustments appropriately to reduce the maximum benefits under section 415(b)(2)(C) for a retirement age before age 62 in the plan, where the plan does not provide for forfeiture of the participant's benefits at his death.

Petitioner contends that the section 415(b) limitation on annual benefits for defined benefit plans where the participant's benefits are not forfeited at death need only be discounted for the time value of money--that is, for the appropriate interest rate--between the plan's early retirement age and age 62.  Respondent, on the other hand, argues that the annual benefit limitation must be converted into a lump sum using a factor accounting for both interest and mortality, then discounted for the time value of money to the plan's early retirement age, and then reconverted into an annual benefit using again a factor accounting for both interest and mortality.  If respondent is correct, then the plan was overfunded and petitioner's contributions to the plan were partially nondeductible.  If that is the case, petitioner may be liable for excise taxes under section 4972 unless an exception applies.

We note that the years at issue in this case are 2002 through 2006 and that the law has changed over the subsequent years, especially with the wholesale repeal of the old regulations and introduction of a new regime under section 415 in 2007. It is axiomatic in our common law that we apply the law as it existed at the time the alleged tax deficiencies arose. See, e.g., Anthes v. Commissioner, 81 T.C. 1, 7 (1983) ("We must apply the law as in effect during the taxable year in issue."), aff'd, 740 F.2d 953 (1st Cir. 1984). Accordingly, we will look to the relevant statutes and regulations as they were effective during the tax years 2002 through 2006.

II. Appropriate Application of Mortality Adjustments Under Section 415(b)(2)(C)

The primary issue in this case is whether petitioner applied the appropriate methodology in calculating the section 415 limitation on benefits for a defined benefit plan that provides for a retirement age earlier than age 62 and where a participant does not forfeit benefits upon death. We hold that petitioner did not.

A. Statutory Background

Section 404(a) provides that an employer's contributions to a pension plan are deductible under that section if they would otherwise be deductible, subject to certain limitations. Thus, in computing the amount of an allowable deduction, "in

the case of a defined benefit plan, there shall not be taken into account any benefits for any year in excess of any limitation on such benefits under section 415 for such year".  Sec. 404(j)(1)(A).

Section 415(a)(1)(A) provides that a defined benefit plan pension trust cannot qualify under section 401(a) if the plan provides for the payment of benefits to a participant exceeding the limitations imposed by subsection 415(b). A benefit exceeds the limitation if, when expressed as an annual benefit, that benefit is greater than the lesser of $160,000 (adjusted annually for cost of living increases, sec. 415(d)) or 100% of the plan participant's average compensation for his high three years, sec. 415(b)(1).  An "annual benefit" is one that is "payable annually in the form of a straight life annuity (with no ancillary benefits)".[4]  Sec. 415(b)(2)(A).  If the benefit is in any other form, it must be adjusted so that it is equivalent to a benefit payable annually in the form of a straight life annuity.  Sec. 415(b)(2)(B).  However, any ancillary benefit not directly related to retirement income benefits is not taken into account, nor is any qualified joint and survivor annuity as defined in section 417.  Id.  Section 417(b) defines a "qualified joint

---

[4]A "straight life annuity" is "an annuity which pays the annuitant a guaranteed amount every month for the annuitant's lifetime."  Sipes v. Equitable Life Assurance Soc'y of U.S., No. C-94-3868-VRW, 1996 WL 507308, at *2 (N.D. Cal. Aug. 13, 1996).

and survivor annuity" for purposes of section 417 and 401(a)(11) (which requires joint and survivor annuities to be qualified) as an annuity "for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse," and "which is the actuarial equivalent of a single annuity for the life of the participant." Thus, even though certain joint and survivor annuities are not taken into account under section 415(b)(2)(B), under section 417(b) they nonetheless must be actuarially equivalent to straight life annuities.

If the retirement benefit under a plan begins before age 62, the $160,000 limitation should be reduced "so that such limitation (as so reduced) equals an annual benefit (beginning when such retirement income benefit begins) which is equivalent to a $160,000 annual benefit beginning at age 62." Sec. 415(b)(2)(C).

There are several limitations on assumptions under section 415. Specifically, in adjusting the benefit (with certain exceptions) and the benefit limitation, the interest rate assumption must be at least 5%.[5] Sec. 415(b)(2)(E)(i). In calculating such adjustments, the mortality table used should be one prescribed

---

[5]For plan years beginning in 2004 and 2005, the minimum interest rate was increased to 5.5%. See Pension Funding Equity Act of 2004, Pub. L. No. 108-218, sec. 101(b)(4), 118 Stat. at 598.

by the Secretary and "be based on the prevailing commissioners' standard table * * * used to determine reserves for group annuity contracts issued on the date the adjustment is being made". Sec. 415(b)(2)(E)(v). For plan years beginning with 1995, the Commissioner established a mortality table based on a fixed blend of 50% of the male mortality rates and 50% of the female mortality rates from the 1983 Group Annuity Mortality Table. Rev. Rul. 95-6, supra. This is the mortality table applicable to the section 415 limitation on benefits for tax year 2002. For distributions with annuity starting dates on or after December 31, 2002, the Commissioner promulgated an updated mortality table based on the 1994 Group Annuity Reserving Table. Rev. Rul. 2001-62, supra. This is the mortality table applicable to the section 415 limitation on benefits for tax years 2003 through 2006.

B.      Relevant Regulations and Guidance

The Secretary has also promulgated regulations under section 415. For the years at issue, sections 1.415-1 through 1.415-10, Income Tax Regs., published in the Federal Register on January 7, 1981, T.D. 7748, 46 Fed. Reg. 1697, were in effect. These regulations were replaced entirely by sections 1.415(a)-1 through 1.415(j)-1, Income Tax Regs., effective April 5, 2007, T.D. 9319, 72 Fed. Reg. 16895. Although the parties have cited these later regulations in their briefs,

during the years at issue petitioner did not have the benefit of the new regulations. Accordingly, we will look to the regulations and other guidance as they were in effect for the years 2002 through 2006.

Section 1.415-3(e), Income Tax Regs., provides that where a retirement benefit under a defined benefit plan begins before age 55,[6] "the plan benefit is adjusted to the actuarial equivalent of a benefit beginning at age 55 in accordance with rules determined by the Commissioner." Question-and-answer No. 6 in Rev. Rul. 98-1, 1998-1 C.B. 249, further clarifies that "[f]or purposes of adjusting any limitation under § 415(b)(2)(C) or (D), to the extent that a forfeiture does not occur upon death, the mortality decrement may be ignored prior to age 62". See also Notice 83-10, 1983-1 C.B. 536. Otherwise,

> [i]f the age at which the benefit is payable is less than 62, the age-adjusted dollar limit is determined by reducing the age-adjusted dollar limit at age 62 on an actuarially equivalent basis. In general, §§ 415(b)(2)(E)(i) and (v) require that the reduced age-adjusted dollar limit be the lesser of the equivalent amount computed using the plan rate and plan mortality table (or plan tabular factor) used for actuarial equivalence for early retirement benefits under the plan and the amount computed using 5 percent interest and the applicable mortality table * * *

---

[6] Although the regulation refers to age 55, by the years at issue the statute had been amended to increase the age to 62.

Rev. Rul. 98-1, Q&A-7, 1998-1 C.B. at 251.  Put another way, "in determining actuarial equivalence for this purpose, it is generally necessary to use a reasonable mortality table.  However, the mortality decrement may be ignored to the extent that a forfeiture does not occur at death."  Notice 87-21, Q&A-5, 1987-1 C.B. 458, 460.[7]

C.    The Parties' Arguments

As discussed above, petitioner and respondent applied different methodologies to reduce the maximum benefit under section 415.  Petitioner discounted the benefit by 5% interest for the 17 years between age 62 and age 45.  Respondent, on the other hand, converted the maximum benefit at age 62 into a lump sum, discounted that sum by 5% interest for 17 years, and then reconverted the resulting figure into an annual benefit.  Respondent's conversion from annuity

---

[7]While notices and revenue rulings are not entitled to the deference typically afforded to regulations, they may have value proportional to their persuasive power.  PSB Holdings, Inc. v. Commissioner, 129 T.C. 131, 142 (2007).  During the years at issue in this case, neither the Code nor the regulations provided that "the mortality decrement may be ignored prior to age 62"--this rule was found only in notices and revenue rulings.  See Rev. Rul. 98-1, Q&A-6, 1998-1 C.B. 249, 251; see also Notice 87-21, Q&A-5, 1987-1 C.B. 458, 459; Notice 83-10, 1983-1 C.B. 536.  Accordingly, the rule and its interpretation by the Commissioner have value as evidence of the actuarial practice to disregard mortality decrements for benefits beginning at ages earlier than 62, but are not dispositive on the issue (and at any rate are too vague to speak definitively on the appropriate methodology to be employed in the discounting calculation).

to lump sum and vice versa used a factor derived from APRs, which in turn were derived in part from the designated mortality tables.

Since the plan at issue here provided for survivor benefits and also provided that accrued benefits were fully vested at death, there was no forfeiture on death. Accordingly, under guidance issued by the Commissioner, no mortality decrement was to be applied in calculating the reduced maximum benefit. Petitioner contends that this precludes the use of mortality tables entirely and that respondent erred in converting the annuities to lump sums and back. Respondent's position is that the lack of a mortality decrement applies only to the calculation discounting the maximum benefit's value from age 62 to age 45, but not to the conversion between the annuities and corresponding lump sums.

We resolve the dispute between the parties by determining whether their methods are "actuarially equivalent" as required by section 1.415-3(e), Income Tax Regs. Petitioner seeks simply to discount for interest to derive the reduced maximum benefit value, emphasizing the "equivalent" portion of "actuarial equivalent." Respondent argues that actuarial equivalence essentially is a term of art different from simple equality, placing greater weight upon the "actuarial" portion of "actuarial equivalent." Petitioner criticizes respondent's approach for reducing the maximum benefit twice and thereby allegedly deflating the figure.

Petitioner contends that section 415 requires only an equalization between what a participant will receive beginning at age 45 with what a participant will receive at age 62, while respondent, according to petitioner, compares what a participant will receive beginning at age 45 with what a participant will receive at age 62 if the participant started receiving the benefit at age 45.

### D. Actuarial Equivalence

Actuarial equivalence is an elusive concept not defined in the Code. However, as the U.S. Court of Appeals for the District of Columbia Circuit has observed: "[A]lthough ERISA does not further define actuarial equivalence, we assume Congress intended that term of art to have its established meaning." Stephens v. U.S. Airways Grp., Inc., 644 F.3d 437, 440 (D.C. Cir. 2011). "Two modes of payment are actuarially equivalent when their present values are equal under a given set of actuarial assumptions." Id.; see also Dooley v. Am. Airlines, Inc., No. 81-C-6770, 1993 WL 460849, at *11 (N.D. Ill. Nov. 4, 1993) ("The term 'actuarially equivalent' means equal in value to the present value of normal retirement benefits, determined on the basis of actuarial assumptions with respect to mortality and interest which are reasonable in the aggregate."). Actuarial equivalence ultimately relies on what is being compared and how, and special attention must be paid to the actuarial assumptions underlying the computations.

Berger v. Xerox Corp. Ret. Income Guarantee Plan, 338 F.3d 755, 759 (7th Cir.

2003) ("There is no single actuarial equivalence, because there is no single

discount rate.").

This definition is similar to that provided for in the plan at section 1.3:

"'Actuarial Equivalent' means having an equal present value when computed

using the same actuarial assumptions underlying the funding of the plan as of the

most recent actuarial valuation." In section 7.11(a) the plan states that "[a]ctuarial

equivalence will be determined on the basis of the interest rate and mortality table

specified in the Adoption Agreement," which are 5% and the G.E. Life Table with

five-year setback, respectively, as specified in section 36 of the adoption

agreement. Further, the plan in section 7.11(c) takes care to incorporate by

reference the Commissioner's mortality table: "The section 417 applicable

mortality table is set forth in Rev. Rul. 95-6, 1995-1 C.B. 80."

Respondent has not challenged the plan's actuarial assumptions as

unreasonable, cf. sec. 412(c)(3),[8] and at any rate the plan was restricted by the

---

[8]Petitioner cites heavily the decisions by this Court in Vinson & Elkins v. Commissioner, 99 T.C. 9 (1992), aff'd, 7 F.3d 1235 (5th Cir. 1993), and Citrus Valley Estates, Inc. v. Commissioner, 99 T.C. 379 (1992), aff'd in part, remanded in part, 49 F.3d 1410 (9th Cir. 1995), for putative support for its position on actuarial equivalence. For example, petitioner makes much of the following excerpt from Vinson & Elkins v. Commissioner, 99 T.C. at 47-48:

(continued...)

limitations on certain assumptions in section 415(b)(2)(E).  The outstanding

question is how to parlay these assumptions into an actuarially equivalent amount.

The appropriate methodology for doing so is not apparent from the face of the

definition of actuarial equivalence, nor from the statute or regulations as in effect

during the years at issue.  Therefore, reducing under section 415 the maximum

benefit to its actuarially equivalent value at a retirement age younger than 62

requires reference to practice within the field of actuarial science.

It is on the point of defining actuarial equivalence that expert testimony is

useful to the Court in deciding this case.  Respondent's expert, Mr. Klubock,

---

[8](...continued)
The language of section 415 provides for an adjustment to the
maximum annual benefit of $90,000, depending upon when such
benefit commences.  If the benefit commences before the Social
Security retirement age, a reduction is to be made to the benefit so
that it equals the actuarial equivalent of the $90,000 annual benefit,
which would have begun at the Social Security retirement age.
Although a plan participant would receive a reduced benefit, the
benefit would be payable for a longer period, and therefore he or she
would receive ultimately at least the same total amount of benefits.

Unfortunately, petitioner's reliance on these cases is misplaced.  Firstly, the
concept of equivalence as discussed therein refers to the necessity of making sums
paid at different times actuarially equivalent by discounting for that time interval,
an axiom that is at the heart of actuarial equivalence but which does not inform the
specific method to be used to achieve it.  Secondly, both Vinson & Elkins and
Citrus Valley Estates addressed the requirement under sec. 412(c)(3)--presently
codified at sec. 433(c)(3)--that the actuarial assumptions made by plans' enrolled
actuaries be reasonable, a question not at issue in this case.

although employed by the IRS and therefore not independent, is an experienced actuary with an extensive background in defined benefit pension plans. Petitioner's expert, Professor Wang, although independent and qualified as a mathematician, is not an actuary. Therefore, we must afford his opinions on actuarial principles limited weight.

Furthermore, we agree with respondent's criticism that Professor Wang's report erroneously treats the plan's pension payments as annuities certain. An annuity certain "is an annuity whose payments are certain to be made, and are not contingent on any events or subject to any risk." Angus S. Macdonald, "Annuities", in 1 Encyclopedia of Actuarial Science 74 (Jozef L. Teugels & Bjørn Sundt eds., 2004). Professor Wang took the annuity amounts (which for each year at issue were the section 415 benefit limit at age 62 and a smaller value that was computed by petitioner by discounting that benefit limit by 5% interest for 17 years) as given. He then determined the number of payments for life at age 45 and age 62 using a life expectancy table to arrive at corresponding expectancies of 38.8 years and 23.5 years, respectively. Finally, he factored in 5% interest. In his calculations, Professor Wang incorporated the assumption that the payments will be made for a specific number of years without regard to any contingencies--which is the textbook definition of an annuity certain. See id. Yet, as noted above,

sections 415 and 417 require that the annuity be contingent on the continued survival of either the plan's participant or his survivor. In other words the annuity must be a contingent one, "an annuity whose payments are not certain to be made, but are contingent on specified events," such as those "events that are certain to occur but whose timing is uncertain (such as death)." Id. The latter describes a life annuity, which is "a contingent annuity depending on the survival of one or more persons." Id. Professor Wang's failure to recognize this distinction between annuities certain and life annuities further circumscribes the applicability of his conclusions to this case.

Finally, Professor Wang opines only on a retroactive comparison of the present values of two different numbers. The numbers themselves, which petitioner provided to him, he took as given. Petitioner's purpose in introducing Professor Wang's report was to establish that the reduced age 45 annual benefit limits calculated by petitioner were "actuarially equivalent" to the section 415 benefit limits for age 62 because the present values of the age 45 amounts were smaller than the present values of the age 62 amounts. While these comparisons may be mathematically accurate, they do not speak to the proper method for computing actuarially equivalent values, nor does Professor Wang's approach address the validity of the underlying amounts supplied by petitioner. In view of

this, we are compelled to look elsewhere for corroboration of the appropriate methodology to determine actuarial equivalence.

Thus we turn to Mr. Klubock's expert report. Mr. Klubock is qualified as an expert in actuarial science and has many years of experience in that field, with nearly all his work devoted to defined benefit pension plans. The parties have stipulated the inclusion of his report in the record of this case. We find Mr. Klubock's expert report credible and reliable. Mr. Klubock explains that discounting an annual benefit by a certain number of years, as Professor Wang did in his report, erroneously "compares a value of benefits payable at two different points of time: one at age 62, the other at age 45. In order to be actuarially equivalent they must be compared at age 45." This requires the conversion of the annual benefit at age 62 into a lump sum, followed by discounting for interest only (since no mortality decrement is to be applied) for 17 years, with the resulting value converted from a lump sum into an annual benefit at age 45. Absent the bookend conversions from annual benefit to lump sum and back, Mr. Klubock explains, the "calculation does not correctly reflect life contingencies".

We note that life contingencies are different from a mortality decrement, which, if it were applied here, would require the discounting of the lump sum at age 62 by not only interest but the risk of death as well. Using mortality tables to

convert annual benefit payments into lump sums does not mean that a mortality decrement was applied. A mortality decrement is "a discount factor based on the probability that the participant will forfeit the annuity benefit on account of death." Lyons v. Ga.-Pac. Corp. Salaried Emps. Ret. Plan, 196 F. Supp. 2d 1260, 1269 (N.D. Ga. 2002). Mortality tables are necessary to any computation of actuarially equivalent annuity values, because failure to apply the tables would lead to the anomalous implication that the annuity in question is perpetual. Thus, mortality tables are necessary to account for the probability that a plan's participant will die. A mortality decrement, on the other hand, accounts for the probability that a plan's participant will forfeit the annuity benefit upon his death. Therefore, if a mortality decrement were to apply, it would be applied to the calculation discounting the lump sum at age 62 to age 45. Since no mortality decrement was necessary, however, respondent in this case properly omitted it from the discounting computation.

Mr. Klubock employed the following calculation of the actuarially equivalent value of an annuity at age 62 discounted to age 45 (assuming no forfeiture at death and thus no mortality decrement): multiply (1) the value at age 62 by (2) the APR at age 62 and by (3) the interest discount for 17 years, then (4) divide the product by the APR at age 45.

When this formula is applied for tax year 2002 in the present case, for example, then: (1) the value at age 62 is the age 62 benefit limit of $160,000, (2) the APR at age 62 is 12.456, (3) the interest discount for 17 years at 5% is 0.4363,[9] and (4) the APR at age 45 is 16.426. Therefore, for the 2002 plan year the age 45 benefit limit is calculated as follows: $160,000 \times 12.456 \times 0.4363 \div 16.426 =$ $52,936. This is the same result reached by respondent with respect to the plan's age 45 benefit limit for 2002. The application of this methodology for plan years 2003 through 2006 corroborated respondent's determinations for those years as well.

The methodology is also identical to that contemplated by section 1.415(b)-1(d), Income Tax Regs., which, while promulgated after the years at issue, does reflect amendments to section 415 following the issuance of section 1.415-3, Income Tax Regs., and can serve as an insight into actuarial practice. Thus, section 1.415(b)-1(d)(2)(i), Income Tax Regs., provides with respect to mortality adjustments:

> For purposes of determining the actuarially equivalent amount
> described in paragraph (d)(1)(i) of this section, to the extent that a

[9]This figure is rounded for brevity. Any rounding error is immaterial, since the result does not change if the unrounded figure derived from the calculation of $(1/1.05)^{17}$ is used. At any rate, since 0.4363 is rounded up from $(1/1.05)^{17}$, any rounding error would be to petitioner's benefit.

forfeiture does not occur upon the participant's death before the annuity starting date, no adjustment is made to reflect the probability of the participant's death between the annuity starting date and the participant's attainment of age 62, unless the plan provides for such an adjustment.  * * *

The new regulation, section 1.415(b)-1(d)(7), Income Tax Regs., offers several

examples, one of which describes a situation analogous to that in this case.

The following examples illustrate the application of this paragraph (d). For purposes of these examples, it is assumed that the dollar limitation under section 415(b)(1)(A) for all relevant years is $180,000, that the normal form of benefit under the plan is a straight life annuity payable beginning at age 65, and that all payments other than a payment of a single sum are made monthly, on the first day of each calendar month.  The examples are as follows:

Example 1.  (i) Plan A provides that early retirement benefits are determined by reducing the accrued benefit by 4 percent for each year that the early retirement age is less than age 65.  Participant M retires at age 60 with exactly 30 years of service with a benefit (prior to the application of section 415) in the form of a straight life annuity of $100,000 payable at age 65, and is permitted to elect to commence benefits at any time between M's retirement and M's attainment of age 65.  For example, M can elect to commence benefits at age 60 in the amount of $80,000, can wait until age 62 and commence benefits in the amount of $88,000, or can wait until age 65 and commence benefits in the amount of $100,000.  Plan A provides a QPSA to all married participants without charge.  Plan A provides (consistent with paragraph (d)(2)(ii) of this section) that, for purposes of adjusting the dollar limitation under section 415(b)(1)(A) for commencement before age 62 or after age 65, no forfeiture is treated as occurring upon a participant's death before retirement and, therefore, in computing the adjusted dollar limitation under section 415(b)(1)(A), no adjustment is made to reflect the probability of a participant's

death after the annuity starting date and before age 62 or after age 65 and before the annuity starting date.

(ii) The age-adjusted section 415(b)(1)(A) dollar limit that applies for commencement of M's benefit at age 60 is the lesser of the section 415(b)(1)(A) dollar limit multiplied by the ratio of the annuity payable at age 60 to the annuity payable at age 62, or the straight life annuity payable at age 60 that is actuarially equivalent, using 5 percent interest and the applicable mortality table effective for that annuity starting date under section 417(e)(3)(A)(ii)(I) and § 1.417(e)-1(d)(2), to the deferred annuity payable at age 62 of $180,000 per year. In this case, the age-adjusted section 415(b)(1)(A) dollar limit at age 60 is $156,229 (the lesser of $163,636 ($180,000* $80,000/$88,000) and $156,229 (the straight life annuity at age 60 that is actuarially equivalent to a deferred annuity of $180,000 commencing at age 62, determined using 5 percent interest and the applicable mortality table, without a mortality decrement for the period between 60 and 62)).

Restating the facts of the above example concisely and incorporating the APR calculations by Mr. Klubock for this particular example: (1) the annual benefit payable at age 62 is $180,000; (2) the APR, at age 62 at 5% interest and using the 1994 GAR blended mortality table, is 152.157; (3) the interest discount only with no mortality decrement from ages 62 to 60 at 5% is equal to $(1/1.05)^2$, or approximately 0.907;[10] and (4) the APR, at age 60 at 5% interest and using the 1994 GAR blended mortality table, is 159.010. Applying the formula derived

---

[10]Note that this figure is rounded for brevity. The rounded number, when used in the formula, yields a slightly lower result: $156,224. The accurate result of $156,229 is achieved when the exact interest discount of $(1/1.05)^2$ is plugged into the formula instead.

above to calculate the actuarially equivalent benefit payable at age 60, one arrives at the same result as reached by the regulations: $\$180,000 \times 152.157 \times (1/1.05)^2 \div 159.010 = \$156,229$.

We have found Mr. Klubock's expert report credible and reliable, and, in view of the above, we accept respondent's method to be appropriate for calculating the required reduction in the section 415 dollar limitation. Accordingly, inasmuch as respondent applied this method to calculate the reduced benefit limitation under section 415(b)(2)(C) for the plan, his calculations of the age 45 limits for tax years 2002 through 2006 are correct.

## III. Petitioner's Liability for Section 4972 Excise Taxes

Having established that petitioner incorrectly calculated the benefit limitation under section 415, and that the lower benefit amounts calculated by respondent are correct, we now turn to the question of petitioner's liability for excise taxes under section 4972.

### A. Statutory Background

Section 4972(a) imposes a tax of 10% on an employer's nondeductible contributions to a qualified employer plan. Nondeductible contributions include the excess of an employer's contributions to such a plan over the amount allowable as a deduction under section 404 (determined without regard to

subsection (e) thereof), plus any amounts determined to be nondeductible contributions for the preceding tax year, reduced by the portion of the amount returned to the employer during the tax year or determined deductible under section 404. Sec. 4972(c)(1). For computing nondeductible contributions, the amount allowable as a deduction under section 404 for a tax year is treated as coming first from any carryforwards from preceding years in chronological order-- that is, on a first-in, first-out basis--and second from contributions made during the current year. Sec. 4972(c)(2).

For plan years beginning before 2007, there was an exception applicable to defined benefit plans under section 4972(c)(7), however, which reduced the amount of nondeductible contributions for the year: "In determining the amount of nondeductible contributions for any taxable year, an employer may elect for such year not to take into account any contributions to a defined benefit plan except to the extent that such contributions exceed the full-funding limitation (as defined in section 412(c)(7), determined without regard to subparagraph (A)(i)(l) thereof)." After the years at issue in this case, the full-funding limitation threshold was limited to multiemployer plans only; following this amendment, employers effectively could elect to treat all their contributions to single-employer plans as deductible. Pension Protection Act of 2006 (PPA), Pub. L. No. 109-280, sec.

114(e)(5), 120 Stat. at 855 (replacing "except to the extent that such contributions exceed the full-funding limitation (as defined in section 412(c)(7), determined without regard to subparagraph (A)(i)(I) thereof)" with "except, in the case of a multiemployer plan, to the extent that such contributions exceed the full-funding limitation (as defined in section 431(c)(6))"); see also Worker, Retiree, and Employer Recovery Act of 2008, Pub. L. No. 110-458, sec. 101(d)(3), 122 Stat. at 5099 (providing that the 2006 amendments apply to taxable years beginning after 2007). As indicated by the plan's Form 5500 returns, it is a single-employer plan.

As we noted above, contributions by employers to pension plans are not deductible except to the extent provided for in section 404. Sec. 404(a). Section 404(a)(1)(A)(i), before its amendment on August 17, 2006, effective for years beginning after December 31, 2007, under PPA sec. 801(a), 120 Stat. at 992, limited the allowable deduction to "the amount necessary to satisfy the minimum funding standard provided by section 412(a) for plan years ending within or with such taxable year (or for any prior plan year)," unless the amount of the remaining unfunded cost of employees' service credits or the normal cost of the plan was greater.[11] The 2006 amendment limited this rule to multiemployer plans and

---

[11]Respondent's expert, Mr. Klubock, has pointed out that the minimum funding standard "was the applicable limit for the years under examination."

established a more generous limit for single-employer plans at new section 404(o), which capped the deduction at the greater of either (1) the excess of the funding target, target normal cost, and cushion amount over the value of the plan's assets or (2) the sum of the minimum required contributions under section 430.

During the years at issue, section 412(a) provided that a plan satisfied the minimum funding standard if, at the end of the plan year, the plan did not have an accumulated funding deficiency--that is, the plan should not have an excess of total charges to the funding standard account for all plan years over the total credits to such account for such years.[12]

As we observed above, section 404(j)(1)(A) provides that in computing the amount of an allowable deduction, "in the case of a defined benefit plan, there shall not be taken into account any benefits for any year in excess of any limitation on such benefits under section 415 for such year".  Therefore, by simple arithmetic, the more significant the limitation on benefits under section 415, the

[12]Effective for plan years beginning after December 31, 2007, new sec. 430 was added to the Code by the Pension Protection Act of 2006, Pub. L. No. 109-280, sec. 112(a), 120 Stat. at 826, which provided for minimum required contributions by single-employer defined benefit plans.  A minimum required contribution is, (1) if the plan's assets are less in value than the plan's funding target, the sum of the plan's target normal cost and shortfall or waiver amortization charge or (2) if the value of the plan's assets is equal to or greater than the funding target, the target normal cost of the plan reduced (but not below zero) by such excess.  Sec. 430(a).

smaller a plan's minimum funding standard becomes. A reduced minimum funding standard implies a smaller allowable deduction on contributions to that plan.

B.     Petitioner's Section 4972 Excise Tax Liabilities

In view of the lower section 415 benefit limitation he calculated, respondent computed, during the course of his audit for petitioner's tax years 2002 through 2006, correspondingly lower limits on the deductibility of petitioner's contributions to the plan for each of those years. Those lower limits on deductible contributions in turn resulted in excess contributions subject to the 10% excise tax under section 4972.

Besides challenging respondent's recalculation of the plan's section 415 benefit limitation, petitioner has not assailed the accuracy of respondent's computations of petitioner's excess contributions and corresponding excise tax amounts. Accordingly, unless petitioner can demonstrate the applicability of an exception to the excise tax, such as under section 4972(c)(7), we must hold petitioner liable for the tax.

C.  Applicability of the Section 4972(c)(7) Defined Benefit Plan Exception

As we noted earlier in our discussion of the statutory background to the section 4972 excise tax, section 4972(c)(7) provides an exception applicable to defined benefit plans under which an employer may elect to disregard nondeductible contributions for purposes of the excise tax, except inasmuch as those contributions exceed the full-funding limitation, as defined in section 412(c)(7) without regard to subparagraph (A)(i)(I) thereof.  Effective for tax years after 2007, the full-funding limitation with respect to the election no longer applies to single-employer plans, of which the plan is one.

Section 412(c)(7), before its amendment effective for plan years beginning after December 31, 2007, PPA sec. 111(a), 120 Stat. at 820, and disregarding subparagraph (A)(i)(I) thereof as instructed by section 4972(c)(7), defined "full-funding limitation" as the excess of "the accrued liability (including normal cost) under the plan (determined under the entry age normal funding method if such accrued liability cannot be directly calculated under the funding method used for the plan)" over the lesser of the plan's assets' fair market value or their value as determined on the basis of a reasonable actuarial method of valuation accounting for fair market value.

However, neither the statute nor the regulations provide any guidance on how to make the election under section 4972(c)(7). Petitioner contends that in the absence of any guidance, not filing an excise tax return on Form 5330 should be considered tantamount to making the election. In support of its argument, petitioner points out that in Feinberg v. Commissioner, 377 F.2d 21, 24 n.2 (8th Cir. 1967), aff'g 45 T.C. 635 (1966), the U.S. Court of Appeals for the Eighth Circuit noted that "[a] taxpayer need not make an affirmative election regarding the nonrecognition of gain under § 1033(a) of the 1954 Code." But what petitioner neglects to mention is that the following sentence in that decision reads: "The regulations explicitly state that a failure to include gain on an involuntary conversion in gross income reported on a tax return will be deemed an election to have the nonrecognition provisions of § 1033(a) apply." Id. There is no such regulation in this case.

There is no clear precedent for what constitutes a valid election where the Code calls for an election but there is no regulation or guidance specifying how it is to be made. We have approached the question case by case. In some instances we have held that an affirmative election in a timely filed income tax return is required. See, e.g., Commons v. Commissioner, 20 T.C. 900, 903 (1953) ("Judicial decisions have generally required taxpayers to make an affirmative

election in a timely filed income tax return in order to elect to report a sale of property on the installment method under section 44(b), I.R.C.").  In others, we have been skeptical of inferring a requirement to make a formal election.  See, e.g., Griffin v. Commissioner, T.C. Memo. 1965-91, 24 T.C.M. (CCH) 467, 472 ("The Commissioner has been given rather broad rulemaking authority by section 453 and it would seem that if he considered it to be a reasonable and valid requirement under the statute that an affirmative election to use the installment method be made in an original and timely filed return for the year of sale, he would so provide in his regulation.").

In this case, what we find particularly troublesome with petitioner's assertion that its not filing a Form 5330 is tantamount to making a section 4972(c)(7) election is that it is untimely and self-serving.  A taxpayer cannot claim sufficient intent to make the election without something more concrete to evince such intent than its pinky-promise well after the fact that it really did intend to make it.  Petitioner's retroactive assertion of an intended election is especially unconvincing in view of petitioner's agreement to pay the income tax deficiencies arising out of respondent's disallowance of a portion of petitioner's claimed deductions for contributions to the plan in tax years 2004 and 2005.  This Court entered stipulated decisions on March 3, 2010, to that effect in docket Nos. 7124-

08 and 29393-08. Notwithstanding the six years that have passed since that time, petitioner to date has not filed any Forms 5330 for those years nor for any of the others at issue in this case. Had petitioner done so timely, it would have been able to evidence its section 4972(c)(7) election by completing the appropriate line on the Form 5330.[13] Petitioner did none of the above and instead claims in its opening brief that "the settlement of the Tax Court cases was intended as a temporary step and not a concession." This Court is hardly a waystation for taxpayers waiting for Godot: Our decisions, if not appealed, are final. See sec. 7481(a)(1).

In the light of the above, we find that petitioner has failed to make a valid election for any of the tax years 2002 through 2006 under section 4972(c)(7) to disregard certain nondeductible contributions. We need not reach the question of the proper calculation of the full-funding limitation. The maximum tax-deductible contribution under section 404 is equal to the minimum funding standard under

---

[13]The line is for "Nondeductible section 4972(c)(6) or (7) contributions exempt from excise tax". This line is 13j in Part II of the November 2002 and October 2003 revisions of Form 5330; line 14j in Part II of the August 2004 and March 2007 revisions; and line 10 in Schedule A of the January 2008 and subsequent revisions. Indicating a value in this line of the excise tax return necessarily presupposes that the taxpayer made the election. A taxpayer may also evidence its election by submitting a protective election with the Form 5500 filed on behalf of its pension plan.

section 412(a), the computation of which, as respondent's expert has explained, depends on the section 415 benefit limitation. We have found in favor of respondent with respect to the reduction in the section 415 limitation and so hold petitioner liable for section 4972 excise taxes.

IV.    Additions to Tax

Respondent has determined against petitioner additions to tax under section 6651(a)(1) and (2) for failure to file tax returns and to pay tax. While the calculation and imposition of such additions is an objective computation, petitioner contends that it had reasonable cause for its failures timely to file and pay tax. We disagree.

A.    Additions to Tax for Failure To File Tax Returns and To Pay Tax

Section 6011(a) requires that any person made liable for a tax or with respect to its collection "shall make a return or statement according to the forms and regulations prescribed by the [Treasury] Secretary." "The return or statement shall include therein the information required by the applicable regulations or forms." Sec. 1.6011-1, Income Tax Regs. Specifically, an employer liable for tax under section 4972 "shall file an annual return on Form 5330 and shall include therein the information required by such form and the instructions issued with respect thereto." Sec. 54.6011-1(a), Pension Excise Tax Regs.

Section 6651(a)(1) provides that if a taxpayer fails to file when due a return required by one of several listed subchapters, including subchapter A of chapter 61 (within which section 6011 falls), "unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the amount required to be shown as tax on such return 5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 5 percent for each additional month or fraction thereof during which such failure continues," but not to exceed 25% in the aggregate.

Section 6651(a)(2) further requires in the case of a taxpayer's failure "to pay the amount shown as tax on any return specified in paragraph (1) on or before the date prescribed for payment of such tax" an addition to tax of "0.5 percent of the amount of such tax if the failure is for not more than 1 month, with an additional 0.5 percent for each additional month or fraction thereof during which such failure continues, not exceeding 25 percent in the aggregate."  As with the addition to tax for failure to file, a showing that the failure was due to reasonable cause and not willful neglect may serve as a defense.  Id.

In the case of returns prepared by the Secretary under section 6020(b), which authorizes the Secretary to prepare a return on behalf of a taxpayer which fails to timely file a required return, such returns are disregarded for purposes of

determining the addition to tax for failure to file a return under section 6651(a)(1). Sec. 6651(g)(1). However, returns prepared by the Secretary are treated as if they were filed by the taxpayer for purposes of determining the amount of the addition under section 6651(a)(2) for failure to pay the tax shown on a return. Sec. 6651(g)(2).

Petitioner failed to file Forms 5330 for tax years 2002 through 2006, and instead respondent prepared a substitute for return for each of the years at issue. Furthermore, petitioner neglected to make any payments of the excise tax due for any of the years at issue. There is no evidence in the record to demonstrate that petitioner paid any amounts of excise tax, even after arriving at a stipulated decision with respondent for tax years 2004 and 2005 with respect to petitioner's disallowed deductions for contributions to the plan. Since we have determined respondent's assessment of the excise tax in this case to be proper, we find that unless petitioner is able to demonstrate reasonable cause for failing to file the Forms 5330 and to pay the excise tax due, petitioner is liable for the additions to tax determined by respondent.

B.   Reasonable Cause for Failure To File or Pay

The regulations require that a taxpayer have exercised "ordinary business care and prudence" and nevertheless been unable to file a return within the time

prescribed or to provide for the payment of the taxpayer's liability. Sec. 301.6651-1(c)(1), Proced. & Admin. Regs. Petitioner has not asserted inability to file the Forms 5330, however, nor has petitioner claimed financial inability or undue hardship to excuse its failure to pay the section 4972 excise taxes due. Cf. id. Rather, petitioner argues that it reasonably relied on the advice of its attorney that it was unnecessary to file returns. See United States v. Boyle, 469 U.S. 241, 250-251 (1985) ("Courts have frequently held that 'reasonable cause' is established when a taxpayer shows that he reasonably relied on the advice of an accountant or attorney that it was unnecessary to file a return, even when such advice turned out to have been mistaken. * * * This Court also has implied that, in such a situation, reliance on the opinion of a tax adviser may constitute reasonable cause for failure to file a return."); see also Zabolotny v. Commissioner, 97 T.C. 385, 400-401 (1991) ("[R]easonable cause within the meaning of section 6651(a)(1) can be shown by proof that the taxpayer supplied all relevant information to a competent tax adviser and relied in good faith on the incorrect advice of the adviser that no return was required to be filed."), aff'd in part, rev'd in part on other grounds, 7 F.3d 774 (8th Cir. 1993).

Petitioner contends that it relied on its former counsel, Barry Jewell, whose defined benefit plan prototype documents it used for the plan. Respondent

counters that Mr. Jewell was the promoter of the plan and therefore petitioner could not have reasonably relied upon his advice.

This Court has held that to prove that reliance on the advice of a tax professional constitutes reasonable cause, the taxpayer must demonstrate by a preponderance of the evidence that it meets the following three requirements: "(1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment." Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). "Reliance may be unreasonable when it is placed upon insiders, promoters, or their offering materials, or when the person relied upon has an inherent conflict of interest that the taxpayer knew or should have known about." Id. at 98. While Neonatology Assocs. dealt with section 6662 accuracy-related penalties, we have applied its tripartite analysis to section 6651 additions to tax as well. See, e.g., Charlotte's Office Boutique, Inc. v. Commissioner, 121 T.C. 89, 109 (2003), aff'd, 425 F.3d 1203 (9th Cir. 2005); see also Curet v. Commissioner, T.C. Memo. 2016-138, at *2; Hovind v. Commissioner, T.C. Memo. 2012-281, at *13.

Petitioner has not adduced evidence as to any of the three <u>Neonatology</u> <u>Assocs.</u> factors. The record does not demonstrate Mr. Jewell's professional qualifications or expertise. It is therefore impossible to determine whether petitioner's reliance could be justified under the first prong. As to the second prong, there is nothing in the record to establish what information petitioner provided to Mr. Jewell. Finally, as to the third prong, we find that the evidence corroborates respondent's assertion that Mr. Jewell was a promoter of the plan. The adoption agreement for the plan executed on December 18, 2001, noted the following: "Furthermore, this plan is proprietary to and a trade secret of Jewell, Moser, Fletcher & Holleman, A Professional Association, and may not be used for more than sixty (60) days after the Employer's relationship with Jewell, Moser, Fletcher & Holleman, A Professional Association, has terminated." Similarly, the adoption agreement executed on November 28, 2003, and in effect for the remaining tax years at issue, contained a similar sentence: "Furthermore, this plan is proprietary to and a trade secret of Jewell Law Firm, P.A., and may not be used for more than sixty (60) days after the Employer's relationship with Jewell Law Firm, P.A., has terminated." Since Mr. Jewell--as the creator of, seller of, and holder of proprietary rights to the plan--was not an "independent advisor unburdened with a conflict of interest", <u>see</u> <u>Mortensen v. Commissioner</u>, 440 F.3d

375, 387 (6th Cir. 2006), aff'g T.C. Memo. 2004-279, petitioner could not have relied in good faith upon Mr. Jewell's judgment. Accordingly, petitioner has failed to demonstrate reasonable cause for its failure to timely file the required returns and to timely pay tax and is therefore liable for the additions to tax under section 6651(a)(1) and (2).

V. Statute of Limitations

Finally, we must address petitioner's argument that the statute of limitations bars respondent's assessment. We hold that it does not.

Section 6011(a) requires that any person made liable for a tax or with respect to its collection "shall make a return or statement according to the forms and regulations prescribed by the [Treasury] Secretary." "The return or statement shall include therein the information required by the applicable regulations or forms." Sec. 1.6011-1, Income Tax Regs. Specifically, an employer liable for tax under section 4972 "shall file an annual return on Form 5330 and shall include therein the information required by such form and the instructions issued with respect thereto." Sec. 54.6011-1(a), Pension Excise Tax Regs.

Generally, the Commissioner has three years after a return is filed to assess a tax.[14] Sec. 6501(a). To start the running of the period of limitations, the return must be one "required to be filed by the taxpayer" and not "a return of any person from whom the taxpayer has received an item of income, gain, loss, deduction, or credit". Id. If the taxpayer fails to file the required return, then the Commissioner may assess the tax at any time. Sec. 6501(c)(3).

Although respondent had prepared substitutes for returns for the years at issue pursuant to his authority under section 6020(b)(1) ("If any person fails to make any return required by any internal revenue law or regulation made thereunder at the time prescribed therefor * * * the Secretary shall make such return from his own knowledge and from such information as he can obtain through testimony or otherwise."), petitioner to date has not filed any Forms 5330 for any of those years. The substitutes for returns prepared by respondent do not start the running of limitations period. See sec. 6501(b)(3). Therefore, since petitioner is liable for the section 4972 excise taxes and has not filed the forms required by law, respondent's assessment is not time barred.

---

[14]Petitioner did not file a return "on which an entry has been made with respect to" an excise tax, see sec. 6501(b)(4), nor did petitioner file "a return of a tax imposed under" the excise tax provisions of the Code omitting a substantial amount of such tax, see sec. 6501(e)(3), and therefore the special provisions of sec. 6501 relating to excise taxes do not apply here.

Petitioner argues, however, that the plan's filing of Forms 5500 for the years at issue should be deemed the filing of a return required for purposes of the section 4972 excise tax, ostensibly because respondent could have gleaned therefrom all the information necessary to make an assessment. It is true that "[p]erfect accuracy is not required for the document to constitute a return." Appleton v. Commissioner, 140 T.C. 273, 285 (2013). This Court has in the past applied a quadripartite test to determine whether a filed document qualifies as a valid return under section 6501: "(1) the document must contain sufficient data to calculate tax liability; (2) the document must purport to be a return; (3) there must be an honest and reasonable attempt to satisfy the requirements of the tax law; and (4) the taxpayer must have executed the document under penalties of perjury." Id. (citing Beard v. Commissioner, 82 T.C. 766, 774-779 (1984), aff'd, 793 F.2d 139 (6th Cir. 1986)).

We agree with respondent that the Forms 5500 fail the Beard factors. The first and third criteria are the most problematic for petitioner. The Forms 5500 were valid returns and were signed by petitioner under penalty of perjury, albeit on behalf of the plan and not petitioner itself: The second and fourth criteria of the Beard test thus are satisfied. However, with respect to the first Beard criterion, respondent was unable to calculate petitioner's tax liabilities from the data

provided on the Forms 5500 and attached Schedules B without undertaking an audit of petitioner's returns to gather additional information. Form 5330 and Form 5500 were developed with different purposes in mind and are not interchangeable.

Furthermore, with respect to the third Beard criterion, judging by petitioner's pleadings and ongoing failure to file any Forms 5330 even after respondent began his audit, petitioner's failure to file the required forms was due not to its mistaken belief that the Forms 5500 were the appropriate returns to be filed but rather to its erroneous position that it did not owe the section 4972 excise taxes for the years at issue. To be sure, there is no evidence to suggest that the plan's filing of the Forms 5500 was anything but an honest and reasonable attempt to satisfy its legal obligation to file such a return. But we cannot go so far as to conclude that the filing of the Forms 5500 was an attempt to satisfy petitioner's responsibility to file Forms 5330. The Form 5500 is not "a document which on its face plausibly purports to be in compliance" with a taxpayer's obligation to file a Form 5330. Cf. Badaracco v. Commissioner, 464 U.S. 386, 396-397 (1984). Accordingly, the statute of limitations has not begun to run and therefore does not bar respondent's assessment.

VI. <u>Conclusion</u>

Petitioner neglected to apply the correct method to reduce the maximum benefits under section 415(b)(2)(C) for a retirement age before age 62 under its plan, where the plan did not provide for forfeiture of the participant's benefits at death. By virtue of this error, portions of petitioner's contributions to the plan during tax years 2002 through 2006 were nondeductible, resulting in liability for section 4972 excise taxes. Petitioner is further liable for additions to tax under section 6651(a)(1) and (2) for its failure to file Forms 5330 and to pay the excise taxes. Petitioner did not have reasonable cause for this failure. Finally, since petitioner never filed the Forms 5330, the statute of limitations does not bar the assessment and collection of the excise taxes and additions to tax.

We have considered all of the parties' arguments, and to the extent not discussed above, conclude that those arguments are irrelevant, moot, or without merit.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent</u>.